**CHEMICAL BANK, Plaintiff,**

v.

**H. B. LAYNE, Defendant.**

**No. 73 Civ. 283–CSH.**

United States District Court,
S. D. New York.

Dec. 14, 1976.

Zalkin, Rodin & Goodman, New York City (Harold N. Schwinger, New York City, of counsel), for plaintiff.

Raymond F. Gregory, New York City, for defendant.

## MEMORANDUM

HAIGHT, District Judge:

In this action, before this court on the basis of diversity of citizenship,[1] plaintiff Chemical Bank ("Chemical") sues to enforce a guaranty executed on July 10, 1970 by defendant H. B. Layne ("Layne") in respect of the liabilities of one Eugene J. Cohen ("Cohen") to Chemical arising out of a demand promissory noted dated July 1, 1966.

The case was tried to the court without a jury on September 2 and 3, 1976. Extensive and able post-trial memoranda have been filed by counsel.

Chemical's theory of liability is straightforward. Layne executed a guaranty of Chemical's demand loan to Cohen; Cohen's indebtedness under that loan amounted to $101,919.34 with interest of $10,768.75 to May 12, 1972 and interest thereafter plus reasonable attorneys' fees of $15,000 as provided for in Cohen's note; Layne is liable for these amounts as guarantor. At the trial Chemical's *prima facie* case required two minutes flat and consumed three pages of the 385-page transcript. Plaintiff offered in evidence, without objection, the note executed by Cohen on July 1, 1966 in favor of Chemical; Layne's guaranty of July 10, 1970; and a statement of agreed facts reflecting, *inter alia,* the amounts for which Chemical sued. Chemical thereupon rested, subject only to further proof on the reasonable amount of the attorneys' fees, that question being deferred until decision on Layne's liability under the guaranty.

Layne's denial of liability presented, in the pleading stages, a bristling arsenal of alternative defenses. His second amended answer reinforced a general denial by six affirmative defenses, and added three counterclaims. Layne prays for rescission of the two guaranties he executed;[2] punitive and exemplary damages in an amount of $250,-000; and reasonable attorneys' fees in an amount to be determined.

Layne pleaded several defenses based upon fraudulent concealment by Chemical, and also alleged violation by Chemical of the Securities Act of 1933 and S.E.C. regulations. It is unnecessary to discuss all the defensive theories in detail. It is apparent from the post-trial briefs that Layne bases his defense upon Chemical's failure to disclose certain facts to Layne prior to the time Layne executed the guaranties.

Specifically, Layne charges that prior to his execution of the first guaranty on April 28, 1970, Chemical failed to disclose to Layne:

(1) that there were restrictions on the transfer of shares of Brilund Mines Company which Chemical was holding as collateral on the Cohen loan;

(2) that Cohen had guaranteed other loans made by Chemical to other individuals or companies; and

(3) that the bank officer in charge of the Cohen account had determined to release other individual guarantors of the Cohen loan.

Layne charges further that, prior to execution of his second guaranty on July 10, 1970, Chemical again failed to disclose the restrictions on the Brilund shares; the existence of Cohen's other guarantees; the actual release of other guarantors of the Cohen loan (the bank's intentions of April having been implemented by July); and the release, in May, of other collateral securing the Cohen loan.

In essence, Chemical does not dispute the facts of these non-disclosures. It contends

---

1. The suit was instituted in New York Supreme Court, New York County, and removed to this court by defendant, a Florida resident.

2. While Chemical brought suit only on the July 10, 1970 guaranty (Ex. 2), Layne had previously executed a guaranty of Cohen's indebtedness to Chemical under date of April 28, 1970 (Ex. R). The circumstances under which this earlier guaranty was executed are material to the execution of the second.

that they are without legal significance; that Chemical was under no duty to disclose them; and that Layne is bound by the terms of his July 10, 1970 guaranty.

## I.

### The Applicable Legal Standards

The guaranty in suit provides that New York law governs the contract and the rights and obligations of the parties.[3] Accordingly this court looks to New York law for resolution of the issues. *Mohasco Industries, Inc. v. Giffen Industries, Inc.,* 335 F.Supp. 493, 496 (S.D.N.Y.1971).

It is well settled under New York law that, in certain circumstances, an obligee's failure to disclose material facts to a guarantor or surety will void the obligation. The burden of sustaining the defense is on the guarantor. A recent statement summarizing New York law appears in *State Bank of Albany v. McDonnell,* 40 A.D.2d 905, 337 N.Y.S.2d 697 (3rd Dept. 1972):

"Absent a clear showing that the bank was guilty of fraudulent concealment or misrepresentation or circumstances inconsistent with a bona fide transaction, the surety undertaking may not be avoided. *Bostwick v. Van Voorhis,* 91 N.Y. 353; *Howe Machine Co. v. Farrington,* 82 N.Y. 121; *Security Nat. Bank of Long Is. v. Compania Anonima De Seguros,* 21 Misc.2d 158, 190 N.Y.S.2d 820, affd. 10 A.D.2d 872, 199 N.Y.S.2d 532. The bank's duty was to disclose only those facts within its knowledge which were of such vital importance to the risk as to make it obvious that non-disclosure would, in effect, amount to a contrary representation to the surety. The defense of fraud fails unless there was concealment of material facts which were so important that if the surety had known them they would not have undertaken the risk. (*Howe Machine Co. v. Farrington,* supra.)." 337 N.Y.S.2d at 699.

A bank's duty of disclosure in cases such as this is described generally in *First Citizens Bank & Trust Co. v. Sherman's Estate,* 250 App.Div. 339, 294 N.Y.S. 131 (4th Dept. 1937):

" 'A surety is "a favored debtor." His rights are zealously guarded both at law and in equity. The slightest fraud on the part of the creditor, touching the contract, annuls it.' *Magee v. Manhattan Life Ins. Co.,* 92 U.S. 93, 98, 23 L.Ed. 699. A contract of guaranty is 'one in which the guarantor is entitled to a full disclosure of every point which would be likely to bear upon his disposition to enter into it.' *Barns v. Barrow,* 61 N.Y. 39, 42, 19 Am.Rep. 247. The law imposes upon a creditor the duty of dealing with his surety with the utmost good faith at every step in the transaction. Honesty and fair dealing required the bank to speak out, and correct the false impression which was entertained by decedent, and for which the bank was largely, if not wholly, responsible. While in many instances mere silence cannot be made the basis of fraud, yet, where the circumstances are of such a nature as to impose a duty upon one to speak, and where he deliberately fails to do so, his neglect will be deemed a deliberate suppression of the truth, and will amount to constructive, if not actual, fraud. A concealment of facts which, if known to the surety, would have deterred him from entering into the contract of suretyship, or which increased the risk of his undertaking, constitutes fraud, and will prevent an enforcement of his obligation." 294 N.Y.S. at 139.

It is equally clear that duties of inquiry and awareness fall upon the guarantor. In *Mohasco Industries, Inc. v. Giffen Industries, Inc., supra,* this court said in applying New York law:

"In order to constitute fraud, however, silence on the part of the obligee must be tantamount to affirmation of a state of affairs which does not exist and which would have the effect of deceiving or defrauding the surety. The obligee is not under an obligation to disclose to a surety information of which the surety has

---

**3.** Ex. 2, last paragraph.

knowledge readily to hand. A surety cannot 'rest supinely, close his eyes, and fail to seek important information' and then seek to avoid liability under the guaranty by claiming he was not supplied with such information. *Magee v. Manhattan Life Insurance Co.,* 92 U.S. 93, 23 L.Ed. 699 (1875). Moreover, as stated in *Bostwick v. Van Voorhis,* supra:

> '. . . [T]hey [sureties] must inquire and inform themselves of all the facts they desire to know, and if they omit to seek for or obtain the requisite information, they cannot easily avoid the bond upon inferential or unsatisfactory proof that they were drawn into signing it by bad faith on the part of the obligee. Before a bond in such a case can be avoided, the fraud and bad faith should be brought home to the obligee by quite clear and decisive evidence, otherwise bonds of this character will furnish a very precarious security to the parties who take them.' (91 N.Y. at 360–361)" 335 F.Supp. at 497.

These are the general principles to be applied to the case at bar. In their light, I turn to the evidence.

## II.

*The Events Leading to Execution of the First Guaranty in April, 1970*

Chemical's primary obligor was Cohen, who on July 1, 1966 executed a demand note for $250,000.[4] The Chemical loan officer in charge of the account was Charles W. Charles, until, in May of 1970, he was replaced by Richard L. Herrington.

Cohen used securities as collateral for his loan. Charles permitted Cohen considerable latitude in the substitution of securities standing as collateral; the loan cards[5] reflect numerous transactions. It is apparent that Cohen was an active trader in the market.

In 1968, Cohen had a "big position" in the stock of Brilund Mines Company; the shares Cohen held were freely traded, not investment shares. This testimony was given by John Maggio, a friend and sometime business partner of Cohen, who also owned Brilund stock. In 1969 Maggio, at Cohen's expense, went to Southwest Africa to examine the Brilund Mines operation. On his return Maggio purchased 10,000 shares of *restricted* Brilund stock. The purchase price was $30 per share, or a total of $300,000. Maggio put up about 800 shares' worth, or $24,000; a Dr. Saperstein put up about 1200 shares' worth, or $36,000; and Cohen put up the balance.

The 10,000 share certificate[6] contained this restriction on its reverse side:

> "This stock is held for investment purposes and should not to be [sic] transferred, sold or otherwise disposed of until registered under the United States Securities Act of 1933, as amended, or until such transfer, sale or other disposition is exempt from registration under that Act."

Prior to 1969, Chemical had held unrestricted Brilund shares as a part of the collateral for the Cohen loan. In July, 1969 or thereabouts, the loan officer, Charles, accepted 7400 of the 10,000 restricted shares as collateral. The record is uncertain as to whether these restricted shares were accepted in substitution for other Brilund shares or other collateral; but it is clear that Chemical placed certain restrictions on the use of the restricted shares as collateral. Charles testified:

> "Q When you, originally, accepted the restricted shares, did you have an agreement or understanding with Mr. Cohen concerning how much of his loan could be collateralized by that restricted stock?
>
> "A Yes, I did.
>
> "Q Would you tell the Court what that understanding or agreement was?
>
> "A We agreed to permit 20 percent of Mr. Cohen's loan to be secured by these unregistered shares.

---

4. Ex. 1.

5. Ex. A and Ex. B.

6. Ex. 5.

"Q Was there not also, in that understanding, a restriction on the value of those shares?

"A For purposes of valuation, we would allow 50 percent of the quoted market price or $20 a share, whichever was less.

"Q When you say '50 percent of the quoted market price,' are you referring to the market price of the stock sold over-the-counter?

"A Yes, sir.

"Q You were aware that the stock was sold over-the-counter?

"A Oh, yes." T. 11–12 [7]

The price of Brilund stock in the over-the-counter market declined during the fall of 1969 and the winter and spring of 1970. By April of 1970, the Brilund restricted stock collateralized more than 50 percent of the outstanding amount of Cohen's loan, contrary to Charles' original condition that this stock not secure more than 20 percent of the loan.

Charles had been pressing Cohen:

". . . for some time to build up the collateral to this loan to support it, to secure it, adequately, and as efforts were made in those directions, the market continued downward so the pressure was on Mr. Cohen to present security, to furnish security." T. 38

It is against this background that Layne executed his first guaranty of the Cohen loan.

Cohen was personally acquainted with one Bruce Brown, who was also acquainted with Maggio. Brown was the son-in-law of defendant Layne. Layne is engaged in the land development and dredging business in Florida. The business appears to be successful, and Layne is a man of considerable resources and experience. Layne testified that he was introduced by his son-in-law Brown to Cohen in late 1969; subsequently Brown introduced Layne to Maggio. Layne saw Cohen on three and Maggio on about four occasions prior to the events of April 28, 1970; Layne described these occasions as "social".

With Cohen under pressure from Charles to increase the collateral on his loan, Maggio decided to assist him by attempting to enlist the help of Layne. At Maggio's request, Brown arranged a meeting on April 27, 1970 at the Drake Hotel, where Layne was staying on a visit to New York. That meeting was followed by another meeting at Chemical on the following day, April 28, attended by Charles and Herrington for Chemical, and Layne, Maggio, Brown and Cohen. It is necessary to consider the evidence of what transpired at these meetings in some detail. There are sharp conflicts in the testimony in respect of the April 28 meeting.

*The April 27, 1970 Meeting at Layne's Hotel*

Layne testified that Maggio told him Cohen was in financial trouble; that "Gene was going to commit suicide if he didn't get some help"; and that Cohen owed the bank in excess of $100,000 "and that they had collateral which covered the loan but it was under-collateralized, percentage wise, and that they had to have some help because the bank was calling, putting the pressure on them to collect the loan." Layne expressed willingness to "go down and talk to the bank and see if there is anything I can do." Layne could not recall if Brilund Mines stock was identified as collateral on the loan; but Maggio did say that the loan was "collateralized"; Layne responded: "Well, I'll talk to the bank about it." [8]

Maggio had pledged the restricted Brilund shares to Chemical as collateral on the Cohen loan. However, at the April 27 meeting with Layne, Maggio refrained from telling Layne that the Brilund shares

---

7. This was the only time Charles, as a Chemical loan officer, accepted restricted stock as collateral on a loan. T. 13.

8. T. 243–4. Layne gave comparable testimony concerning the April 27 meeting at his deposition. He described his willingness to "go the bank and see what the whole situation is." T. 298. Layne recognized that the information given him at the April 27 meeting had not been complete. T. 308.

were restricted. Maggio did not tell Layne of the restriction because he was attempting to get Layne to help Cohen, and he felt that such information "would not help my position with Layne." [9]

While Layne and Brown had minor holdings in Brilund Mines at this time, those shares were unrestricted. Both Layne [10] and Brown [11] testified that, at this time, they had no knowledge that the Brilund shares pledged to Chemical were restricted.

*The April 28, 1970 Meeting at Chemical*

Layne, accompanied by Maggio, Brown and Cohen, called at Chemical at 10:00 a.m. on April 28. Charles and Herrington awaited them. Charles had been told by Cohen or Maggio that Layne "was going to come into the bank." [12] Charles had before him the loan cards showing the collateral status and activity on the Cohen loan since its inception. Charles had also obtained advice from Chemical's legal department [13] that a Layne guaranty on Cohen's obligations, if obtained, would "carry through to the Morgan loans" if Cohen failed in his obligations as first guarantor. This was a reference to loans Chemical had previously made to two companies and two individuals [14] which Cohen had guaranteed. The outstanding balances on these loans, as of April 28, totaled $92,500; Cohen's direct liability on his loan on that date was $140,000; and so his total liability to the bank was $232,500. [15]

The principals at the April 28 discussion were Layne and Charles. Layne testified that he "asked Mr. Charles if he could explain what the situation was to me"; Charles replied that:

". . . they had collateral, but percentagewise, it was under-collateralized, and mostly by Brilund Mines stock, and that the collateral—I don't recall the exact amount, but the collateral was about the same as the amount of the indebtedness." T. 246.

Layne testified further that he asked Charles: "Well, what's this Brilund Mines stock worth as of today?" Charles gave instructions to a bank employee, unknown to Layne, to call a broker's office and find out the current quotation. The answer that was reported was $17 a share. Armed with that information, Layne testified, "we added the securities up and the amount of stock", and "the collateral was very close to the amount of the note." [16]

Brown corroborates Layne's inquiry about collateral in general; the value of the Brilund stock in particular; and the telephone call, instigated by Charles, which produced a reported quote of $17 a share. [17]

Maggio had no specific recollection of the conversations. Neither did Cohen; he testified that his memory was affected by a series of electric shock treatments undergone subsequent to the April 28 meeting. [18]

As for the Chemical witnesses, Charles testified on the first day of trial, under subpoena by defendant as part of his case, and then in rebuttal for Chemical. Herrington did not appear at the trial. Defendant offered his deposition, commenced on January 14, 1975 and concluded on March 11.

When he testified on the first day of trial, Charles acknowledged under question-

9. T. 138–9.

10. T. 242.

11. T. 167.

12. Charles, T. 38.

13. Ex. L.

14. Jordan Electric Corp., Pichninich Travel Service; one Barney Morgan; and one Roy Morgan.

15. Charles, T. 46–7.

16. T. 257–8.

17. T. 160, 180. Chemical made no objection to Layne's testimony concerning Charles' instructions *to telephone* a broker, and the reported $17 figure. Brown's comparable testimony was attacked as hearsay. The objection is not well founded. If I accept the testimony as credible, the report was made by a bank employee, and is admissible under Rule 801(d)(2)(D), Federal Rules of Evidence.

18. T. 142.

ing by Layne's counsel that the subject of Brilund Mines came up at the April 28 meeting, and "I did tell him [Layne] that Brilund Mines was a substantial portion of the collateral."[19] This testimony followed:

"Q Did you tell him that it collateralized in excess of 50 percent of the loan?

"A *Specifically, no.*

"Q Did you tell him that the Brilund stock, that 7400 shares of Brilund stock on deposit with the bank, was restricted letter stock? Did you tell him that, sir?

"A *Not in those words.*

"Q Did you tell him that stock couldn't be sold on the open market?

"A *Not specifically.*" T. 31–2 (emphasis added)

On "cross examination" by Chemical's counsel, Charles testified that he told Layne "we would continue to hold the block of Brilund Mines stock because no other bank would accept that as collateral."[20] This is the explanation of Charles' testimony on direct that he did not advise Layne that the Brilund stock was restricted "in those words". The full truth, of course, was no other bank would accept the Brilund stock as collateral because it *was* restricted. Charles tiptoed up to the brink of full disclosure about the Brilund stock and then tiptoed back down again.

Charles also testified on "cross" that he "did not recall" a telephone call to a broker about the price of Brilund over-the-counter; "I don't think we made any such call"; he did not recollect that Layne asked him to.[21]

Charles did not recall any discussion at all about the current price of the Brilund stock, "though there may have been."[22] Called by Chemical on rebuttal on the second day of trial, Charles categorically denied obtaining a quotation on Brilund.[23]

Herrington's evidence was given by deposition. At the April 28 meeting he was junior to Charles, not yet having assumed responsibility for the Cohen account. Herrington recalled that there was a discussion of "what the collateral would be in a general way." He testified that the bank was willing to carry the loan "with collateral value in about the same amount as the loan. We discussed the collateral in a general way, you know, as to what it would be." Layne was told by Chemical's representatives that the collateral was equal to the size of the loan on April 28.[24]

On the subject of Brilund stock, Herrington denied at the first session of his deposition that there had been any inquiries about it,[25] but testified at the second session that Brilund was mentioned as "stock that was pledged as part of the collateral"; Layne was told that the loan "would be secured by the Brilund Mines stock and whatever other stocks."[26]

Herrington also testified that he did not telephone a broker to get a Brilund quotation, and that he did not recall Charles making one.[27] He also denied that there was any discussion of the *marketability* of any of the stock serving as collateral.[28] In that testimony he isolates Charles, who as noted *supra*, said he told Layne that no other bank would accept the Brilund stock as collateral. Both Layne and Brown deny having heard such a remark.

Substantial differences exist with respect to what transpired at the April 28 discussion. I must resolve the conflicts as best I can. No independent evidence demonstrates the truth or falsity of either version.

---

19. T. 31.

20. T. 42; T. 63.

21. T. 42.

22. T. 60, on redirect by Layne's counsel.

23. T. 353.

24. H. dep. 20, 22, 24. Layne testified that Charles told him "the value of the collateral approximated the outstanding balance of the loan." T. 326.

25. H. dep. 26.

26. H. dep. 92–3.

27. H. dep. 58–9.

28. H. dep. 92.

The demeanor of the witnesses appearing before me was equally impeccable. I find assistance, however, in principles of common sense.

Layne was a successful and experienced business man; Chemical itself stresses the fact. That being the case, it is unlikely that Layne would guarantee the sizable loan of a casual social acquaintance without first inquiring into the status of the loan and its underlying collateral. At the conclusion of the April 27 meeting, when Maggio first approached him through Brown on the subject, Layne expressed the intention of making such inquiries at Chemical the following day. I am satisfied that at the April 28 discussion he acted on that intention.

Specifically, I find that at the beginning of the April 28 discussion, Layne did not know the Brilund shares formed a part of the collateral, let alone the most substantial part. Neither did Layne know that the particular Brilund shares furnishing that collateral were restricted. Chemical invites me to draw the inference that Layne must have had this knowledge, but the bases for the suggested inference are purely speculative, and I decline the invitation.

I find that Layne inquired as to collateral generally; that Chemical's representatives identified Brilund as forming a substantial portion of the collateral; and that Layne then inquired as to the present market value of Brilund. Such an inquiry on Layne's part is wholly consistent with his stated purpose at the discussion. I further find that Charles, in response to Layne's question, initiated a further inquiry which produced the over-the-counter trading value of Brilund for that day. Layne and Brown remember the response as $17 per share. Chemical argues that their evidence must be rejected because the actual spread on Brilund on that day was several dollars less. But the discrepancy may with equal plausibility be explained by an error in the memory of Layne and Brown on the point, or an error by the Chemical employee making the report or the broker to whom he spoke. And even if the defendant's testimony as to

the telephone call is rejected, I find as a fact, as Layne testified, that computations were made at the April 28 discussion which tended to demonstrate, in accordance with the bank representatives' assurance to Layne, that the value of the collateral was equal to the then outstanding amount of the loan. Such computations, in all probability, involved valuation of the Brilund stock at the normal market rates produced by trading. Those were the only valuations appearing on the loan cards, which Charles brought to the meeting for the purpose of his discussions with Layne. The specific fact that the Brilund shares were restricted, with a necessarily lower value, was not disclosed to Layne.

I find, in sum, that at the time he signed the April 28 guarantee Layne held the impression that freely traded, unrestricted Brilund stock formed the greater part of the collateral, and that accordingly the total amount of collateral was roughly equal to the loan balance. His understanding was incorrect; and non-disclosure by Chemical contributed to Layne's misapprehension of the facts.

The Chemical representatives also refrained from disclosing to Layne at the April 28 meeting the nature or details of the Chemical loans to others which Cohen had guaranteed; and that Charles had already formed the intention of releasing other individual guarantors of the Cohen loan. In contrast to the Brilund stock issue, there are no factual issues on these matters; Chemical concedes non-disclosure as alleged by Layne.

The legal consequences of these several non-disclosures are considered below.

One other subject was emphasized in the testimony. Layne argues that he never contemplated actually having to pay out on his guaranty, and that Chemical representatives gave him assurances upon which he relied that no demand would be made upon him. Layne testified that Charles told him the bank was "prepared to ride this thing out", that is, not call the guaranty. Charles, while not specifically recalling such a statement, does not deny that he made it,

since it would have reflected the present state of his thinking:

"A  The bank's anticipation was that we would pretty much, as Mr. Layne had said, go along or whatever, and use our reliance upon his guarantee to support the value of the collateral that we had on this loan. In other words, as long as the value of the collateral stayed reasonably at its existing level, it would be—the bank would be satisfied with the reliance we had anticipated in Mr. Layne's situation.

"Q  But in the bank's contemplation, what would happen if there was a further decrease in the value of that collateral?

"A  Well, if there was a substantial decrease in the value of the collateral, then we would have to again, as we did, take some action or see the guarantor or see what could be done." T. 377.

Chemical objected to this line of testimony as inadmissible under the parol evidence rule, and as violative of public policy excluding oral disclaimers of liability under written banking · obligations. The Court, hearing the case without a jury, received the evidence subject to Chemical's motion to strike. That motion is now granted,[29] and the evidence referred to plays no part in the resolution of this case.

### III.

#### The Execution of the Second Guaranty in July, 1970

Layne executed the April 28, 1970 guaranty in the circumstances described above. He had limited the amount of his guaranty to $150,000, and limited its duration to 90 days, a period which would expire in late July.

In May Herrington had succeeded Charles as the loan officer in charge of the Cohen account. He decided to call the prior Layne guaranty unless Layne executed a

new one, this time unlimited as to amount or duration.[30]  When this information was relayed to Layne, he appeared at Chemical with Brown on July 10, 1970 and executed the guaranty upon which suit is now brought. Herrington attended for Chemical. The discussion was brief. Layne executed the new guaranty. Layne now contends—and Chemical does not dispute—that at the July 10 meeting, Herrington did not tell Layne that the Brilund shares were restricted; or that other guarantors of the Cohen loan had in fact been released by Chemical subsequent to Layne's execution of the April 28 guaranty; or that Chemical had released, in May, other collateral (not Brilund shares) securing the Cohen loan.

Chemical contended on the trial that the April 28 guaranty and the circumstances of its execution by Layne were irrelevant because suit is brought only on the July 10 guaranty. I reject that contention. Layne's July 10 guaranty was spawned by the guaranty of April 28; it is clear that Layne executed the latter guaranty only in response to Chemical's expressed intent to enforce the former one. If sins of non-disclosure exist in respect of the parent guaranty, the consequences of those sins are inevitably visited upon the head of its offspring.

I turn to the decisive question of whether Chemical's non-disclosures, as I have found them to be, are of legal consequence.

### IV.

#### Consequences of Chemical's Non-Disclosure

■ Layne's obligations are not affected by Chemical's non-disclosure of the Cohen guaranties on other loans; or of the release of other guarantors on the Cohen loan; or of the pre-July release of part of the Cohen collateral. Both guaranties executed by Layne vested Chemical with great latitude in its dealings with Cohen.[31]  In addition,

---

**29.** See *Manufacturers Hanover Trust Co. v. Transnational Communications, Inc.*, 36 A.D.2d 709, 319 N.Y.S.2d 510.

**30.** H. dep. 51.

**31.** Each guaranty provided:

"*The undersigned hereby consents that from time to time, before or after any default by the Borrower or any notice of termination*

the guaranties expressly provided that they cover "the payment of all liabilities of the Borrower to the Bank of whatever nature, whether nor existing or hereinafter incurred . . ." Layne agreed to these terms by signing the documents, and cannot now avoid their effect. That effect is to extend the guaranties to any of Cohen's obligations to Chemical; and to give Chemical wide freedom of choice in its dealings with Cohen. Having granted Chemical such broad coverage and freedom of choice, without first inquiring into the underlying facts or seeking to restrict Chemical's powers, Layne cannot now complain of non-disclosure of specific transactions which clearly fall within the general powers granted to Chemical. Sureties must "inquire and inform themselves of all the facts they desire to know", *Bostwick v. Van Voorhis*, 91 N.Y. 353, 360 (1883), particularly in the face of language such as that contained in the present guaranties.[32] Had Layne asked about the existence of other Cohen loans and received misleading answers, the case would of course be quite different.

■ Non-disclosure by Chemical of the restricted nature of the Brilund stock held as collateral stands on a different footing.

No language in the guaranties alerted Layne to this possibility. Nor did Layne have this information "readily to hand" from other sources, *Mohasco Industries, Inc. v. Giffen Industries, Inc., supra*, at 335 F.Supp. 497; the restricted nature of these particular shares would not be revealed by Layne's inquiry (if he made one) as to the over-the-counter market value of unrestricted shares. Chemical argues (brief, p. 39) that "if Layne was defrauded by anyone, the perpetrators were his own friends and confidants"—i. e., Maggio and Cohen, who knew the stock was restricted and did not tell Layne prior to the April 28 meeting. But the argument does not address the issue of whether Chemical, with the same knowledge, should have disclosed the information in response to Layne's inquiries about collateral.

I hold that, in all the circumstances of the case, Charles, the Chemical loan officer in charge of the Cohen account, should have disclosed to Layne the restricted nature of the Brilund stock at the April 28 meeting.

The fact was material because the restricted nature of the shares substantially reduced their value as collateral. That proposition is conceded by Chemical;[33] indeed, Chemical's own concern with the restricted nature of the Brilund shares is reflected by the limitations originally placed by Charles upon their use as collateral. As noted above, the restricted Brilund shares were not to secure more than 20 percent of the loan; and their allowed value was only *50 percent of quoted market price* or $20 a share, *whichever was less.*[34]

In these circumstances, Chemical can hardly deny the significance of the restrict-

hereof, with or *without further notice to or assent from the undersigned, any security at any time held by or available to the Bank* for any obligation of the *Borrower, or any security at any time held by or available to the Bank* for any obligation of any other person secondarily or otherwise liable for any of the Liabilities of the Borrower, may be exchanged, surrendered or *released* and any obligation of the Borrower, or of any such other person, may be changed, altered, renewed, extended, continued, surrendered, compromised, waived or *released in whole or in part,* or any default with respect thereto waived, and the Bank may fail to set off and may release, in whole or in part, any balance of any deposit account or credit on its books in favor of the Borrower, or of any such other person, and may extend further credit in any manner whatsoever to the Borrower, and generally deal with the Borrower or any such security or other person as the Bank may see fit; and the *undersigned shall remain bound under this guaranty notwithstanding* any such exchange, surrender, *release,* change, alteration, renewal, extension, continuance, surrender, compromise, waiver, inaction, extension of further credit or other dealing." (emphasis supplied)

**32.** See also *Mohasco Industries, Inc. v. Giffen Industries, Inc., supra.*

**33.** H. dep. 75.

**34.** A valuation at 50 percent of market price appears reasonable, in view of Maggio's testimony that he bought the restricted Brilund shares in July, 1969 at $30 a share, when the over-the-counter price was $60. T. 133.

ed nature of the Brilund shares it was holding as collateral. Layne testified that had he known the stock forming the greater part of the collateral was restricted, he would not have executed the April 28 guaranty. I accept that testimony. It is consistent with the intent and nature of Layne's inquiries at the bank, as I have found them to be.

Under the pertinent authorities, the element of *inquiry* by the proposed guarantor is crucial. In certain circumstances a bank may be under no duty to take the initiative and volunteer disclosure; it does not follow that, if inquiry is made by the guarantor, the bank's disclosure can be less than complete. Certainly that is so where significant facts, relevant to the guarantor's inquiry, lie within the bank's knowledge, but do not lie "readily to hand" for the guarantor.[35]

In *State Bank of Albany v. McDonnell, supra,* the Appellate Division held guarantors liable. The guaranty, given by the defendants Iannello, extended to debts owed to the bank by the defendants McDonnell. The Iannellos, seeking to avoid the guaranty, argued that the bank had made insufficient disclosure of the McDonnell's obligations. The majority, rejecting that argument, stated:

"*The Iannellos made no inquiry for information from the bank concerning the McDonnells.* Apparently the bank *knew little more about them than Iannellos* except that the bank had a credit statement. That revealed that the McDonnells had prior debts and were not in a strong position financially, hence the need for the guarantee. But that is not enough to void the guarantee. (*Security Nat. Bank of Long Is. v. Compania Anonima De Seguros, supra.*) It has been held that even when the creditor knows of prior defaults or irregularities by the debtor, it is not obligated to disclose this knowledge to the surety *without an in-*

quiry. (*Howe Machine Co. v. Farrington, supra; Bostwick v. Van Voorhis, supra.*)" 337 N.Y.S.2d at 699 (emphasis added).

In *Howe Machine Co. v. Farrington,* 82 N.Y. 121 (1880), the guaranty was of an agent's indebtedness to his company, existing at the date of the bond or which might be thereafter incurred, on account of the agent's failure to deliver or account for merchandise consigned to him by the obligor. Before the date of the bond the agent, one Davis, had received a shipment of machines on consignment for which he had failed to account. That default was not disclosed to the guarantor before execution of the bond. The Court of Appeals held that such non-disclosure, under the circumstances of the case, did not void the bond. The Court recognized the general rule that:

"If any fraud was practiced by the plaintiff to induce the defendant to become surety for Davis, the bond cannot be enforced. The non-disclosure of material facts known to the plaintiff, and of which the defendant was ignorant, which it was the duty of the plaintiff to communicate to the defendant when he entered into the guaranty, would operate as a fraud and relieve him from liability. There may be circumstances known to a party taking a guaranty for the conduct of another, of so decisive a character that it could not be supposed that if known to the surety he would have entered into the obligation, and in such a case the party taking the security cannot withhold the information and enforce the obligation." 82 N.Y. at 125.

However, the Court held the rule inapplicable on these particular facts:

"In the case before us, there is no finding that the plaintiff fraudulently concealed from the defendant, when he executed the bond, the state of the account between the company and Davis, and there is no evidence from which fraud can be inferred. The existence of the default of

35. The phrase "readily to hand" comes from this court's decision in *Mohasco Industries, Inc. v. Giffen Industries, Inc., supra.* While Maggio and Cohen of course knew the Brilund shares were restricted, that knowledge did not lie readily to hand for Layne, since it is clear the fact was being deliberately concealed from him.

Davis on the prior transactions with the company is found, but it is not found under what circumstances it originated. It does not appear that Davis had been guilty of any dishonesty, or that his indebtedness to the company may not have been attributable to misfortune, or other cause, consistent with his honesty. The company required Davis to furnish a bond to cover past and future indebtedness. He procured the defendant to execute the bond in question. *The defendant had. no communication with the company before signing it.* The bond in terms referred to an existing indebtedness of Davis. *The defendant made no inquiry of the company to ascertain the particulars,* and the company made no representation. If the defendant deemed it material to be informed of the origin, nature or extent of the existing indebtedness, he should have inquired of the company before executing the bond. The company was under no duty to seek the defendant and make the disclosure. It was bound to act with good faith toward the defendant; but to hold the surety discharged by the omission to advise him of the particulars of the previous transactions with Davis, *in the absence of any inquiry on the subject,* would establish a rule which would make instruments of the character of the one in question of comparatively little value." 82 N.Y. at 126–7 (emphasis added).

Each case turns on its own circumstances, as Judge Lehman held for the Court of Appeals in *Donovan v. Aeolian Co.,* 270 N.Y. 267, 200 N.E. 815 (1936), cited with approval by the Second Circuit in *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 283 (2 Cir. 1975). Plaintiff, purchasing what she believed to be a new piano, was permitted by defendant's salesman to believe that a used instrument was in fact new. The Court stated generally:

"If the seller does not know that the buyer is acting under the belief that the article is new and unused, and has done nothing to induce that belief, the buyer

cannot complain. There is no duty upon the seller to speak where silence does not constitute deception. Silence may, however, constitute fraud and deception where the seller has notice that the buyer is acting upon a mistaken belief as to a material fact. *It depends upon the circumstances of each case whether failure to disclose is consistent with honest dealing. Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent."* 270 N.Y. at 271, 200 N.E. at 816 (emphasis added).

The closest case on the facts to the one at bar is *First Citizens Bank & Trust Co. v. Sherman's Estate, supra.* One Sherman executed a guaranty of the plaintiff bank's loans to one Hatfield. The original guaranty and a second one, subsequently executed, purported to set forth in detail the collateral held by the bank as security for Hatfield's loan. The first item listed was an assignment to the bank of Hatfield's interest in the estate of his father; the major portion of that estate was a farm. Prior to Sherman's execution of the first guaranty, the bank had released back to Hatfield the interest in that farm. Sherman did not know of that release of collateral when he signed the guaranty, and the bank did not tell him. The Appellate Division held that, in the circumstances, the bank's non-disclosure was wrongful, and rejected its claim on the guaranty. Sherman had died, and could not testify that he had relied on the bank's description of the collateral; but the Court held that such reliance was proved by the circumstantial evidence.[36] The Court stated:

"Of course, if decedent drew either of the guaranties, and inserted the items of collateral held as security for Hatfield's loan on his own responsibility, his estate can hardly claim that he was deceived by the bank into thinking that it held more collateral for Hatfield's indebtedness than was actually the case. But where could the information as to the amount and

---

**36.** In the case at bar we have Layne's direct evidence on the point.

details of this collateral come from except from the bank, or from Hatfield, and Hatfield does not claim to have given it to decedent. . . .

"It was the duty of the bank to speak out, and correct the false impression which the decedent had, and which the bank knew he had. If respondent can now profit by its silence, and can enforce a contract entered into by decedent without knowledge of the true facts, it puts a premium on the suppression of truth and lack of frankness, if not on actual deceit." 294 N.Y.S. at 138–9.

The Court then stated the general principle which I quoted at the beginning of this opinion.

Chemical seeks to distinguish *Sherman* from the case at bar because the guaranty in *Sherman* listed the collateral, whereas the present guaranty does not. In the circumstances of the instant case, this is a distinction without a difference. Layne in effect asked for a comprehensive statement of the collateral before executing the first guaranty; the bank's response omitted a material fact concerning the collateral, namely, the restricted nature of the Brilund shares. It is true that this court in *Mohasco, supra,* distinguished *Sherman* on the ground that in *Sherman* the guaranty listed the collateral, see 335 F.Supp. at 497; but Judge Bryan then went on to say in *Mohasco*:

"In the case at bar, on the other hand, there was no representation by Mohasco [the obligee] that it would continue dealings with Marsh or that it would not terminate the Marsh relationship as it had a legal right to do. Giffen [the guarantor], *fully familiar with the terms of the arrangement,* had no basis for relying on its continuation by Mohasco. There was, thus, no duty on Mohasco to disclose that it was contemplating termination, if, indeed, that were the case." 335 F.Supp.

at 498 (emphasis and material in brackets supplied).

Without stating the facts of *Mohasco* in detail, the foregoing quotation is sufficient to demonstrate that they bear no meaningful resemblance to those of the case at bar.

Chemical stresses the testimony of Charles that (without explaining why) he told Layne the Brilund shares would not be accepted as collateral by any other bank. This is said to be sufficient to put Layne and Brown "on notice . . . that there was some question or doubt pertaining to the immediate transferability of these shares" (brief, p. 35). Presumably the argument is that Layne, having received such notice, should have inquired further. In the first place, I find from a preponderance of the evidence that Charles did not make such a statement. Layne and Brown deny it, and Herrington did not recall it. But even if the truth of Charles' testimony on the point is assumed, the fact remains that Layne had *already inquired* about the collateral. Under the pertinent cases, Chemical was under a duty to make full and complete disclosure to its intended guarantor. The bank cannot give an incomplete response to the initial inquiry and then argue that, precisely because the response was incomplete, Layne should have inquired further.[37]

Chemical also warns that a judgment in Layne's favor "would establish a rule which would make guaranties, which are widely used, of little value" (reply brief, p. 17). The argument affords an example of the familiar advocate's gambit *ex hypothesi horribili ad judicem terrendum.*[38] No broad or dire consequences flow from the case at bar. To ensure the enforceability of guaranties, banks need do no more than make full and fair disclosure in response to the inquiry of a potential guarantor.

I have considered Chemical's other arguments, and find them without merit.

---

37. Compare *General Crushed Stone Co. v. State of New York,* 19 N.Y.2d 737, 279 N.Y. S.2d 190, 191, 225 N.E.2d 893, 894 (1967): "Nor is any claim of carelessness by the surety avail-

able as a defense to the affirmative defense alleging fraud."

38. "Terrify the judge by the hypothesis of horrible consequences."

I hold that Chemical, responding to Layne's inquiry about underlying collateral, failed to disclose a material fact, in breach of the legal duty which arose in the circumstances of the case. For that reason I sustain the defense to the action, and dismiss the complaint.

## V.

■ Layne's counterclaims remain for consideration. He claims punitive and exemplary damages and attorneys' fees.

While I have concluded that the guaranty cannot be enforced, the basis for non-enforceability is limited to non-disclosure of the restricted nature of the Brilund shares. Layne complains of other non-disclosures, but I have held that, in the circumstances, Chemical breached no duty in respect of them.[39] While Chemical's non-disclosure on the Brilund shares was wrongful, for the reasons I have stated, it does not in my judgment constitute conduct "so 'gross and wanton' as to bring it within the class of malfeasances for which punitive damages may be awarded." *James v. Powell,* 19 N.Y.2d 249, 260–1, 279 N.Y.S.2d 10, 18–19, 225 N.E.2d 741, 747 (1967). Accordingly, the counterclaims are dismissed.

## CONCLUSION

The foregoing constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R.C.P.

The Clerk of the Court is directed to enter judgment dismissing the complaint and the counterclaims, with costs in favor of defendant, in an amount to be taxed.

It is So Ordered.

---

**39.** See discussion at pp. 877–878, *supra.*