William **GREENBLATT** and Peter N. Salzarulo, as Chairman and Co–Chairman, respectively and Trustees of the Joint Industry Board of the Plumbing Industry of the City of New York and Funds Administered by Joint Industry Board of the Plumbing Industry of the City of New York, Peter N. Salzarulo, in his capacity as President of Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Peter N. Salzarulo, Individually and Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Plaintiffs,

v.

**DELTA PLUMBING & HEATING CORP. and New York Surety Company, Defendants.**

No. 89 Civ. 7759 (RWS).

United States District Court, S.D. New York.

Sept. 29, 1993.

See also 818 F.Supp. 623.

Kaming & Kaming, New York City (Joseph S. Kaming, Elizabeth C. Kaming, Sean O'Donnell, of counsel), for plaintiffs.

Hollander & Associates, P.C., New York City (Michael R. Strauss, of counsel), for defendant New York Sur. Co.

### OPINION

SWEET, District Judge.

This action by Plaintiffs William Greenblatt and Peter N. Salzarulo as Chairman and Co–Chairman, respectively, and Trustees of the Joint Industry Board of the Plumbing Industry of the City of New York and Funds Administered by Joint Industry Board of the Plumbing Industry of the City of New York ("the Board"), Peter N. Salzarulo, ("Salzarulo") in his capacity as President of Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Peter N. Salzarulo, individually, and Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO (the "Local") (collectively, the "Plaintiffs") against Defendant Delta Plumbing & Heating Corp. ("Delta") and Defendant New York Surety Company ("New York Surety") was tried to the Court on May 10, 1993. Upon the following findings and conclusions, judgment will be entered on the complaint.

### Prior Proceedings

This action was commenced on November 20, 1989 against Delta to enforce an obligation to the Board arising out of the Collective Bargaining Agreement ("CBA") between the Association of Contracting Plumbers of the City of New York, Inc. and the Local by the filing of a complaint. Service was made through the Secretary of State.

The Board previously filed actions against Delta in the Southern and Eastern Districts to enforce its rights on April 27, 1987, November 4, 1988, and November 20, 1989. Delta filed a petition in bankruptcy on March 21, 1991, and the action was stayed against it. New York Surety moved for summary judgment dismissing the complaint, which motion was denied on May 23, 1991, familiarity with which is assumed.

Following the trial on May 10, 1993, a briefing schedule was set, and final submissions were completed on July 7, 1993.

### Findings of Fact

The Board is the agent of Local Union No. 2 under the CBA with respect to the collection and administration of the various benefits provided under the CBA. Delta is a plumbing contractor subject to the terms and provisions of the CBA which required the posting of a surety bond containing certain guarantees as a condition of supplying union labor to the contractors covered by the CBA.

The CBA provides, among other things, as follows:

16. *FRINGE BENEFITS PAID TO PLUMBING INDUSTRY BOARD:* The Employer must pay the aforementioned Fringe Benefits, Supplemental Benefits and Contributions, Holiday Fund Benefits and Security benefits to the Plumbing Industry Board as administrative and/or collection agency of the various trust funds herein mentioned ...

\* \* \* \* \* \*

18. *FRINGE BENEFITS, FAILURE TO PAY:* In the event an Employer shall default in payment of fringe benefits provided for by the terms of this Agreement, it shall be considered the same as failure to pay wages, and all Employees shall not be permitted to work for any Employer who is delinquent in the payment of fringe benefits. Failure to pay fringe benefits is a violation of the laws of the State of New York. In addition, if after proper notification an Employee continues to work for a delinquent Employer, the Union will bring the Employee up on charges before the "Local 2" Executive Board.

\* \* \* \* \* \*

22. *SURETY BOND TO GUARANTY PAYMENT OF FRINGE BENEFITS:* Each Employer shall furnish a bond of an agreed form by a Surety Company approved by the New York State Insurance Department to the benefit of the Joint Plumbing Industry Board to guaranty the payment of the Fringe Benefits herein mentioned, Security Benefits and any and all other benefits and contributions. The amount of the bond shall be in conformity with the action taken by the Joint Finance Committee of the Joint Plumbing Industry Board ... In the event an Employer fails to pay Fringe Benefits within the prescribed period, the Employer in arrears, in payment of Fringe Benefits, shall be required to pay Fringe Benefits weekly. If delinquent, an Employer shall post a bond double the aforelisted bond requirements. The Plumbing Industry Board shall not issue a job or shop work card to an Employer who is not satisfactorily bonded. All Employers must obtain a current and valid job or shop card from the Plumbing Industry Board, Local 2 in accordance with the customs and regulations of the Board.

\* \* \* \* \* \*

83. *COMPOSITION OF BOARD:* There is a Joint Plumbing Industry Board in the jurisdiction of Local Union No. 2 which consists of an equal number of union representatives and bona fide established contractors ...

84. *BOARD TO RECEIVE FRINGE BENEFITS PAYMENT:* The Joint Plumbing Industry Board shall continue to receive, beginning with the effective date of this Agreement from each Employer ... all Fringe and Supplemental Benefits

and Contributions mentioned in this Agreement.

Delta provided a bond to the Board as required by the CBA written by Continental Casualty Company ("Continental") in the amount of $80,000 which was effectively cancelled by Continental on or about June 14, 1989. Delta failed to furnish a union benefits bond for the period of June 14, 1989 through January 28, 1990.

By letter dated August 16, 1989, the Board sent a letter to Delta notifying it that it had no bond and that:

Failure to comply with the above bonding regulations makes your firm delinquent. Your jobs may be stopped, your bond will be doubled and, if you are a monthly contractor, you will have to pay weekly. When a contractor is determined to be delinquent, it will be a requirement that a contractor pay weekly—both wages and fringes—by check to the employees ...

The letter was re-sent on September 21, 1989 and denominated as a "Final Notice."

By letter dated October 11, 1989 the Board notified Delta that it was in breach of the Agreement and that Delta's "delinquent bond should be (double bond schedule) $65,000.00." By letter dated December 27, 1989, the Board again notified Delta that it had no bond and stated as follows:

Failure to comply with all BONDING REQUIREMENTS will cause the following:
1) YOUR JOB WILL BE STOPPED.
2) Your Bond amount WILL BE DOUBLED.
3) If you are a monthly payer, YOU WILL HAVE TO PAY WEEKLY.

The notice was repeated in substantially the same form by a letter to Delta dated January 23, 1990. Copies of the notices were sent by the Board to Salzarulo.

Delta was furnished with union labor during the period of June 14, 1989 through January 28, 1990, by which time Delta owed the Board the sum of $70,316.60.

During the period of July 1989 through June 1990, the only projects at which Delta utilized Local 2 union labor were the following:

(a) East 40th Street Hotel Venture, New York, New York;

(b) 520 West 112th Street, New York, New York; and

(c) 48–52 Market Street, New York, New York.

It is the practice under the CBA for the contracting plumbers to file reports monthly and to make estimated payments of benefits which lag behind the actual liabilities incurred as established by the reports required under the CBA.

On January 29, 1990 a bond was executed and issued by New York Surety for the benefit of Delta as Principal and the Board as Obligee (the "Bond") on a form prepared by the Board.

Prior to the execution of the Bond, Valerie Sanborn, an account executive at the Halland Agency, the producing broker and agent of New York Surety, had discussions with Monika Scheutz, a bookkeeper for the Board, concerning the issuance of the Bond. During the course of those discussions, Ms. Scheutz never disclosed to Ms. Sanborn that: (a) there was a preexisting liability of Delta to the PIB in excess of $70,000.00 or (b) that the Board had commenced an action to recover those delinquencies. New York Surety was generally familiar with the practice of maintaining running balances between contractors and the Board. No credit investigation was conducted other than an inquiry to Delta's bank, which was answered satisfactorily. No litigation search was conducted by New York Surety.

The Bond, in the penal sum of $80,000.00 was executed and issued on January 29, 1990.

The Bond provides:

(1) an amount equal to all required fringe benefits under the Collective Bargaining Agreement on all classifications of employees covered thereunder who are employed by the Principal; ... which amounts shall be due to the Obligee during the term of said Agreement, or written modification, renewal or extensions, or on such other dates or at such other times as may hereafter be agreed upon in writing between the Principal and the Obligee, ... Provid-

ed, however, that this Bond is executed upon the following express conditions:

1. The Surety may cancel its liability as to future assessments under this Bond at any time by notice to Principal and Obligee at least forty-five (45) days in advance of the date of such cancellation.

. . . . .

4. The term of this Bond begins on July 1, 1989 and ends on June 30, 1990; however, the term of this Bond may be continued from year to year by the issuance of a continuation certificate executed by the Principal and Surety and delivered to the Obligee at least forty-five (45) days prior to June 30th of any year.

and covers:

an amount equal to all required fringe benefits ... which amounts shall be due to the obligee (Board) during the term of said Agreement (Collective Bargaining Agreement) ... provided ...

4. The term of this Bond begins on July 1, 1989 and ends on June 30, 1990 ...

As the result of a prior litigation between the Board and Delta in this Court (88 Civ. 7864 (PNL)) a General Release was executed March 4, 1990 by the Board releasing Delta from "any and all claims for the payment of fringe benefits for the period December 29, 1988 through October 31, 1989."

On the following day, March 5, 1990, the Board first gave notice to New York Surety of the alleged delinquency of Delta in the payment of fringe benefits to plaintiffs. The letter estimated Delta's liability to plaintiffs for the period of November 1, 1989 through February 28, 1990 as $95,000.00.

In May 1990 the Board filed an Amended Complaint in this action against Delta and refused to furnish further union labor to Delta.

New York Surety cancelled the Bond by the cancellation notice issued by New York Surety on May 4, 1990 on its form identifying the effective date of the bond as "EFFECTIVE THE 1st DAY OF JULY 1989."

Delta's payroll/benefits reports during the period of November 1, 1989 through May 1990, and moneys paid by Delta (or by third-parties on Delta's behalf) during the November 1989/May 1990 period, contained the following amounts:

| | Report Amount [1] | Amount Paid |
|---|---|---|
| November 1989 | $ 29,201.14 | $ 10,000.00 [2] |
| December 1989 | 20,081.74 | 34,724.29 [3] |
| January 1990 | 18,981.19 | 26,104.04 [4] |
| February 1990 [5] | 22,187.81 | —0— |
| March 1990 [6] | 15,571.64 | 23,600.00 |
| April 1990 | 18,724.93 | 16,698.50 |
| May 1990 | 6,186.83 | 43,513.81 |
| TOTALS: | $130,935.27 | $154,640.64 |

In accordance with its practice, the Board applied payments to the outstanding balances in chronological order. The sum of $26,-104.04 was received from Delta on January 8

---

1. The amounts in this column are the combined amounts due to the Plumbing Industry Board, Plumbers Local 2 and Promotion Fund of Manhattan and Bronx.

2. Applied to amounts due for period August 1 to August 31, 1989.

3. Applied to amounts due for period August 1, 1989 to September 30, 1989.

4. Applied to amounts due for period October 1 to October 26, 1989.

5. Period ended 2/20/90.

6. Period of 2/21–3/27/90.

and 10, 1990 (credited after clearing on January 26, 1990) reducing the balance owing to the Board from Delta to $30,366.04 as of January 26, 1990 (excluding $4,186.30 in National Pension Fund monies which is normally sent directly to the National Pension Fund). After Delta received the New York Surety Bond, Delta did not pay the December contributions when due on February 1, 1990 in the amount of $19,862.19, making the amount owing to the Board for February $50,228.23. Delta did not pay the January contribution when it became due on March 1, 1990 in the amount of $23,684.38, making the amount owing to the Board for March $73,912.61 (not including $6,551.40 in National Pension Funds).

When the Bond was issued, Delta was in fact only overdue for approximately one month, in the amount of $30,366.04. As two months passed without payment for the months of December and January when they became due in February and March respectively, the amount owing became $73,912.61.

Delta did not submit reports identifying its workers and worker hours until payment was made. The Board thus had to estimate amounts owing. When, on March 5, 1991, the Board notified New York Surety and Delta of an estimated Delta liability of $95,000.00, New York Surety offered no protest about being defrauded and did not immediately cancel the Bond.

The amount owing for the period involved, November 1, 1989 to May 22, 1990, as agreed is $42,755.76 in Board Fringe Benefits and $7,883.10 in National Pension Fund fringe benefits for a total owing of $50,638.86.

### Conclusions of Law

#### The Repudiation of Pension Promises Is Disfavored

■ The repudiation of pension promises is disfavored. *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310 (2d Cir.), *cert. denied,* 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990). The Court in *Benson* discussed the significance of the enactment of Section 515 of ERISA (29 U.S.C. § 1145):

> Its stated purpose was to "permit trustees of plans to recover delinquent contributions efficaciously, and without regard to

issues which might arise under labor-management relations law other than 29 U.S.C. 186." 126 Cong.Rec. 23,039 (1980) (remarks by Representative Thompson). This new provision was essential to the viability of employee benefit plans. The high costs associated with employer delinquency detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates. *Id.* Simply put, benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations. For this reason, Congress placed employee benefit plans in a position superior to the original promisee, analogous to a holder in due course.

> The courts of appeals that have construed section 515 have unanimously regarded it as a limitation on the defenses available to an employer when sued by an employee benefit plan.

> \* \* \* \* \* \*

*Id.* at 314 (citations omitted).

Representative Thompson, the manager of the legislation in the House, stated:

> Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

*Id.* at 315.

#### The Bond Renders The Surety Liable For The Period July 1, 1989 Through June 30, 1990

■ The CBA provides that the employer shall furnish a surety bond. As presented in the Statement of Facts, the Bond is unambiguous, covering:

> an amount equal to all required fringe benefits ... which amounts shall be due to the obligee (Board) during the term of said

Agreement (Collective Bargaining Agreement) ... provided ...

4. The term of this Bond begins on July 1, 1989 and ends on June 30, 1990 ...

The execution date of January 29, 1990 does not speak to the term of the Bond, whereas the fourth express condition does: July 1, 1989 through June 30, 1990. As stated in *People v. Lee*, 104 N.Y. 441, 10 N.E. 884 (1887), provisions of the bond must be given their separate intended effect:

While the liability of guarantors is strictissimi juris and cannot be extended by construction beyond the plain and explicit language of their contract, *they are still subject to the rule that effect must be given to all of the language contract (sic), and a meaning and effect, ascribed to each of the word and phrase (sic) used therein,* if it can be done without violating its plain intent.

*Id.* at 449, 10 N.E. 884 (emphasis added).

■ Where the words of a bond do not limit the liability of the surety to future transactions, the surety is liable for breaches committed prior to becoming a surety, as well as for those subsequently committed. *In re Estate of Camarda*, 103 Misc.2d 362, 425 N.Y.S.2d 1012 (Onondaga Cty.1980).

■ Even accepting New York Surety's analysis of New York law, New York Surety is liable for the full stated bond term, July 1, 1989 to June 30, 1990. *Crisafulli Brothers, Inc. v. Clanton*, 128 A.D.2d 963, 512 N.Y.S.2d 927, 928 (1987), states:

It is an established rule of law that the language of guaranty must be given its ordinary meaning. It is equally accepted law that the liability of a guarantor cannot be extended in the application of the guarantee beyond the clear agreement of the parties.

New York Surety correctly asserts that a contract of surety:

shall not be construed to have retroactive operation unless express words *or neces-sary implication* dictate such effect. (citation omitted) [emphasis added].

*Id.*

Express words of the Bond make it applicable from July 1, 1989 to June 30, 1990.

### The Board Did Not Defraud The Surety

*Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990) places an "employee benefit plan in a position superior to the original promisee, analogous to a holder in due course."

In *State v. Peerless Ins. Co.*, 67 N.Y.2d 845, 501 N.Y.S.2d 651, 492 N.E.2d 779 (1986), the Court held:

It has long been settled in this State that absent either an express agreement in the surety bond or inquiry by the surety, a creditor has no duty to keep the surety informed of the debtor's financial situation ... Rather, the surety bears the burden of making inquiries and informing itself of the relevant state of affairs of the party for whose conduct it has assumed responsibility.

*Id.* at 847, 501 N.Y.S.2d 651, 492 N.E.2d 779 (citations omitted).

*Peerless* was cited in *U.S. Capital Ins. Co. v. Buffalo & Erie County Regional Dev. Corp.*, 177 A.D.2d 949, 578 N.Y.S.2d 307 (1991) which reaffirms that a credit type bond obligee has no duty to disclose an obligor's financial situation. The Court stated that the surety:

should not now be permitted to shift liability incurred as a result of its own failure to assess the risk it was undertaking in issuing this bond.

*Id.* at 308.

■ The same result would be reached by applying three Southern District cases cited by New York Surety. *Chemical Bank v. Layne*, 423 F.Supp. 869 (S.D.N.Y.1976); *Marine Midland Bank v. Smith*, 482 F.Supp. 1279, 1288 (S.D.N.Y.1979), *aff'd*, 636 F.2d 1202 (2d Cir.1980); *Morin v. Trupin*, 711 F.Supp. 97, 103 (S.D.N.Y.1989). All the cases voiding a guarantee for non-disclosure, cited by New York Surety, can be distin-

guished as involving active misrepresentation or relating to a fidelity bond involving previous dishonest acts by a designated person.

■ As to other possible issues such as misrepresentation by Delta, it is well settled that when the prime obligor has fraudulently induced a person to sign as guarantor, such fraud may not be used as a defense against the obligee in an action on the guarantee unless the obligee participated in the fraud, *United States v. Basils' Family Supermarket, Inc.*, 259 F.Supp. 139, 141 (S.D.N.Y. 1966); *see also Stapleton Nat. Bank v. United States Fidelity & Guar. Co.*, 60 Misc. 206 113 N.Y.S. 25 (Sup.Ct.1908), *rev'd on other grounds*, 131 A.D. 157, 115 N.Y.S. 372 (1909).

New York Surety also claims that the Bond must not be construed to cover preexisting liabilities because this would render it an illegal contract for financial guaranty insurance under the New York Insurance Law. In support of this contention, they offer the following syllogism. *See* Def.'s Trial Mem. at 15–16. The Bond is ambiguous regarding whether it covers liabilities accruing from the date of execution, January 29, 1990, or from the date indicated in its fourth condition, July 1, 1989. An ambiguous contract that can be interpreted as either legal or illegal should be interpreted as legal. The Bond would be legal if it covered only liabilities accruing from the date of its execution. It would be illegal, however, if it covered liabilities accruing from July 1, 1989, because it would then be a contract for financial guaranty insurance pursuant to New York Insurance Law § 6901. Since New York Surety is not licensed to issue such insurance, their issuance of financial guaranty insurance would be, they claim, illegal pursuant to New York Insurance Law § 6904. Therefore, they conclude, we must construe the Bond as covering only liabilities accruing from the date of its execution in order to construe the Bond as a legal contract.

■ Because the premises of New York Surety's syllogism are faulty, their conclusion is erroneous. It is true that an ambiguously worded contract should not be interpreted to render it illegal where the wording lends itself to a logically acceptable construction which renders it legal. *See Walsh v.*

*Schlecht*, 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977) (applying generally applicable rules of contract interpretation). As discussed above, however, the Bond is not ambiguous. Express words of the Bond make it applicable from July 1, 1989, to June 30, 1990. Whether or not New York Surety violated the New York Insurance Law in issuing the Bond is irrelevant to the present case. The cases cited by New York Surety are not to the contrary. They merely hold that a vendor cannot avoid a contract for the sale of real property by claiming that the purchaser intends to act with regard to the transaction in an illegal manner. *See Lee v. Caric*, 125 A.D.2d 453, 509 N.Y.S.2d 383 (1986); *Galuth Realty Corp. v. Greenfield*, 103 A.D.2d 819, 478 N.Y.S.2d 51 (1984).

As to New York Surety's defenses which may relate to the Union, Federal Labor Law precludes their assertion against the Board. *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990). New York Surety's assertion that the plaintiff misallocated payments made by Delta to satisfy antecedent liabilities is inconsistent with the language of the Bond and of the CBA.

### Conclusion

Judgment will be entered awarding to the Board the sum of $50,638.86 plus costs. Settle judgment on notice.

It is so ordered.