In the Matter of the Claim of the FIRST CITIZENS BANK AND TRUST COMPANY OF UTICA (Successor by Merger to UTICA TRUST AND DEPOSIT COMPANY) against the Estate of SANFORD F. SHERMAN, Deceased.

ROBERT D. SHERMAN and H. J. COOKINHAM, JR., as Executors, etc., of SANFORD F. SHERMAN, Deceased, Appellants; FIRST CITIZENS BANK AND TRUST COMPANY OF UTICA, Respondent.

Fourth Department, March 10, 1937.

*Earle C. Bastow,* for the appellants.

*Arthur L. Evans,* for the respondent.

EDGCOMB, J.   The First Citizens Bank and Trust Company of Utica, successor by merger to the Utica Trust and Deposit Company, has been allowed a claim against the estate of Sanford F. Sherman, deceased, in the sum of $73,017.72, and interest.   Upon this appeal the executors question the correctness of the decision in so far as it relates to an item of $41,367.72 founded upon a contract of guaranty signed by the decedent.

Mr. Sherman died on the 29th day of August, 1930.   On April 11, 1921, he guaranteed to the Utica Trust and Deposit Company " the prompt and punctual payment " at maturity of the notes of his son-in-law, Albert R. Hatfield, up to, but not exceeding, the aggregate of $60,000.   On October 26, 1927, this guaranty was surrendered, and in its place decedent gave the bank another agreement, similar in all respects to the former, except that the amount of Mr. Hatfield's indebtedness which was guaranteed was reduced from $60,000 to $48,000.   Mr. Hatfield owed the bank at that time $47,330.   It is this second guaranty upon which the bank relies to establish its claim.

Appellants urge that both contracts are void and cannot be enforced, because an essential and material item of collateral which the bank represented that it held as security for Mr. Hatfield's indebtedness was in fact not so held, and that the guarantor was thereby misled and deceived to his detriment, and that, by withholding this information from decedent, the trust company was guilty of constructive fraud.

Both the original and the subsequent contract of guaranty purported to set forth in detail the collateral held by the bank as security for Mr. Hatfield's loan.   The first item listed in each instrument reads as follows: " Assignment of A. R. Hatfield's interest in the Estate of his father, George Hatfield."   George

Hatfield died in 1907, and on May 7, 1910, his son conveyed to the Utica Trust and Deposit Company, as collateral security for his indebtedness to the bank, his entire interest in his father's estate, Mrs. Hatfield joining in the conveyance, and thereby releasing her dower right in the real estate. The major portion of this estate consisted of a farm of 205 acres situated in the town of New Hartford, Oneida county, just beyond the city limits of Utica, and which was available for residential development.

So when the statement appeared in the guaranties which were signed by decedent that the bank held as collateral to Mr. Hatfield's indebtedness an assignment of his interest in his father's estate, it naturally conveyed to the reader the information that it was a transfer of the entire interest. Such, however, was not the fact, because on the 22d of January, 1913, long before either guaranty was given, the bank released to Albert R. Hatfield and his wife its interest in the George R. Hatfield farm. This release was known to the bank, but not to Mr. Sherman.

In 1921, when the first contract of guaranty was signed, this farm was worth $500 per acre, and Mr. Hatfield's one-sixth interest therein amounted to $17,083.33, or eighty per cent of his entire interest in the estate of his father. Six years later, when the second guaranty was executed, the value of the farm had increased to $1,000 per acre. The rest of the estate had shrunk in value, and the farm at that time constituted ninety-seven and one-half per cent of the entire estate. Excluding the homestead, Mr. Hatfield's interest in the estate, at the time the guaranty which is relied upon was executed, amounted to $733.33, while with the homestead included the bank would have held security worth $34,733.33. Other collateral, aggregating $25,301 had been assigned to the bank. With all this security the liability of Mr. Sherman on his guaranty would not have been onerous, notwithstanding the fact, as was conceded on the argument, that Mr. Hatfield was financially irresponsible. It would have exceeded the then indebtedness of Mr. Hatfield to the bank. Under these circumstances appellants claim to have brought themselves within the rule laid down in *Howe Machine Co.* v. *Farrington* (82 N. Y. 121) where it is said (at p. 125): " There may be circumstances known to a party taking a guaranty for the conduct of another, of so decisive a character that it could not be supposed that if known to the surety he would have entered into the obligation, and in such a case the party taking the security cannot withhold the information and enforce the obligation."

I have said that the bank was aware of the fact that it had relinquished its interest in the Hatfield homestead. Of this there can

be no doubt. The release was signed and acknowledged by Mr. Day, the president of the bank, at the direction of its board of directors. There is no suggestion that the instrument was fraudulently obtained, or that it was executed under a mistake or misapprehension. The bank cannot be heard to say that it had forgotten or was ignorant of the occurrence.

I have also said that Mr. Sherman was unacquainted with the fact that the bank did not hold the assignment of Mr. Hatfield's interest in the homestead of his father. True, decedent has not come forward and so stated. That he cannot do. But the conclusion which I have reached is the only one which can properly be drawn from the record.

At the outset we have the presumption that the decedent would never have signed this contract of guaranty had he known that the largest item of security listed among the holdings of the bank as security for Mr. Hatfield's indebtedness had been released — an item which, together with the other security, would have been sufficient to wipe out Mr. Hatfield's indebtedness to the bank, and render decedent's liability on his guaranty a mere nominal one. But we do not have to rely upon this presumption, for the record is replete with affirmative evidence that decedent, during all this time, was laboring under the impression that all of Hatfield's interest in his father's estate, the homestead as well as the other securities, was pledged as security for his indebtedness to the bank. Decedent was an intimate friend of Mr. Hatfield, Sr., and knew that upon his death his son, Mr. A. R. Hatfield, became the owner of a one-sixth interest in the homestead. Decedent was a director of the trust company, and had examined the securities held by the bank, and knew of the assignment of Hatfield's interest in the estate of his father. The records of the bank did not show the release of the homestead, so that any one examining Mr. Hatfield's collateral would not have discovered the true situation. Decedent was not, therefore, put on notice. The very wording of the item " Assignment of interest in the Estate of George Hatfield " carries with it the idea that it was a transfer of the whole and not a part of such interest. Especially is that so when we note that the farm constituted practically the entire estate.

In fact, Mr. Day, the president of the bank, and a close friend and business associate of decedent during his lifetime, frankly conceded that decedent, when he executed the guaranty, and down to the time of his death, believed that Hatfield's one-sixth interest in the homestead was a part of the collateral held by the bank as security for Hatfield's indebtedness.

On September 26, 1927, one month before the second guaranty was given, Mr. Day, the president of the bank, wrote decedent a letter listing the securities held by the bank as collateral for Mr. Hatfield's indebtedness, and headed the list with the item of Mr. Hatfield's assignment of his interest in the estate of his father. Mr. Day placed a value opposite this particular security of $25,000. Other items of collateral, totaling $25,301, were listed. To show the accuracy with which the bank was dealing with Mr. Sherman in this respect, attention should be called to certain correspondence between Mr. Day and Mr. Sherman. On October 26, 1927, Sherman wrote Day stating that the list of collateral did not include twenty shares of the Utica Trust and Deposit Company stock which he understood was in the possession of the bank, and two days later Mr. Day replied acknowledging the mistake, and making the correction. The following day Mr. Day wrote decedent and said that, in checking up with the treasurer of the bank, a slight error had been discovered in the amount of the Utica Canning Company stock which was a part of the bank's collateral; that the bank held thirty-nine instead of forty shares. The second guaranty was returned so that the mistake could be corrected. Notwithstanding the meticulous care exercised by the bank to see that the collateral pledged as security to Mr. Hatfield's loan was correctly stated down to a change of a single share of the Utica Canning stock, which was worthless, and so inventoried in the list of securities, the bank withheld from Mr. Sherman knowledge of the fact that ninety-seven and one-half per cent of the value of Hatfield's interest in his father's estate, which had originally been assigned to the bank, had been released, and was no longer pledged as collateral.

But respondent calls attention to a question mark which appears after the figures $25,000 in the letter of September twenty-sixth, and claims that this constituted notice that the item did not include an assignment of all of A. R. Hatfield's interest in his father's estate, or at least that it put Mr. Sherman on inquiry.

Such a claim gives to a question mark an importance and dignity far beyond that to which it is entitled. It is quite apparent that the mark was intended to convey the idea that the value given to the item was merely an estimate, and that its market value could not be definitely determined. This is evident from the fact that the same mark is found after the value given to a note of the Sauquoit Canning Company, which appears to have had a very uncertain value, and from the further fact that a similar mark does not appear in connection with any of the stocks held as collateral, the worth of which could easily be determined by reference to market quotations.

But the bank says that it did not draw this second guaranty, and consequently did not put this item in the list of collateral stated to be held by it as security to Hatfield's note, and, therefore, did not deceive decedent. The evidence as to who drew the second contract of guaranty is rather unsatisfactory. Nothing appears to have been said about a second guaranty until October 26, 1927, when decedent stated in a letter to the bank that he wanted to limit his liability to Mr. Hatfield's then indebtedness, and that he was " therefore enclosing a copy of my [his] original guaranty with the amount changed to $48,000." Hatfield testifies that he never asked decedent for the second guaranty, or for the first one either for that matter. It is quite possible that decedent may have prepared this second guaranty; but if that be so, the fact remains that the bank, with full knowledge that the instrument incorrectly stated a material item of interest to the surety, accepted the guaranty, and did nothing to correct the false impression which was conveyed by the contract itself, and which was entertained by Mr. Sherman.

The bank officials would not admit that the respondent was responsible for the form of the first guaranty. They claimed that, while their attorneys often drew such contracts, they had no set form to be used, and they went so far as to express the opinion that the guaranty of 1921 was not drawn by the bank. Of course, if decedent drew either of the guaranties, and inserted the items of collateral held as security for Hatfield's loan on his own responsibility, his estate can hardly claim that he was deceived by the bank into thinking that it held more collateral for Hatfield's indebtedness than was actually the case. But where could the information as to the amount and detail of this collateral come from except from the bank, or from Hatfield, and Hatfield does not claim to have given it to decedent. Even if we were to assume that decedent drew this second guaranty, it would seem that, when the bank gave him the details of Hatfield's collateral in its letter of September 26, 1927, and when it went so far as to correct a mistake of one share in a worthless stock, decedent was justified in relying upon such information, and copying the list into the second guaranty given one month thereafter, and that the bank cannot relieve itself of responsibility by falling back on the assumption that decedent prepared the guaranty rather than the bank itself.

Again, Mr. Sherman, on April 16, 1925, wrote to Mr. Day, president of the bank, relative to his guaranty, and said: " I am also guarantor of loans amounting to $58,000 made to my son-in-law A. R. Hatfield, who is also a canner. This is also secured by collateral, among which is his assignment of 1/6th interest in his

father's estate consisting of securities and real estate. The real estate is located on high land in and near Utica and will be developed for building purposes. Its value has increased very rapidly, and will continue to increase." It is quite evident from this letter that decedent thought this valuable asset was pledged as security for Hatfield's loan. But the bank knew differently the very moment it received this letter, and yet it held its peace, and permitted decedent to go on believing something which was untrue, and to act on that belief, and two years later to give a new guaranty.

It was the duty of the bank to speak out, and correct the false impression which the decedent had, and which the bank knew he had. If respondent can now profit by its silence, and can enforce a contract entered into by decedent without knowledge of the true facts, it puts a premium on the suppression of truth and lack of frankness, if not on actual deceit. " The contract of suretyship is a contract *uberrimæ fidei.*" (3 Daniel on Negotiable Instruments [7th ed.], § 1508, p. 1543.) Especially is that true where, as here, the contract of surety is purely voluntary. " A surety is a ' favored debtor.' His rights are zealously guarded both at law and in equity. The slightest fraud on the part of the creditor, touching the contract, annuls it." (*Magee* v. *Manhattan Life Ins. Co.,* 92 U. S. 93, 98.) A contract of guaranty is " one in which the guarantor is entitled to a full disclosure of every point which would be likely to bear upon his disposition to enter into it." (*Barns* v. *Barrow,* 61 N. Y. 39, 42.) The law imposes upon a creditor the duty of dealing with his surety with the utmost good faith at every step in the transaction. Honesty and fair dealing required the bank to speak out, and correct the false impression which was entertained by decedent, and for which the bank was largely, if not wholly responsible. While in many instances mere silence cannot be made the basis of fraud, yet where the circumstances are of such a nature as to impose a duty upon one to speak, and where he deliberately fails to do so, his neglect will be deemed a deliberate suppression of the truth, and will amount to constructive, if not actual fraud. A concealment of facts which, if known to the surety, would have deterred him from entering into the contract of suretyship, or which increased the risk of his undertaking, constitutes fraud, and will prevent an enforcement of his obligation. (*Howe Machine Co.* v. *Farrington,* 82 N. Y. 121, 125, 126; *Phillips* v. *United States Fidelity & Guaranty Co.,* 200 App. Div. 208; affd. *sub nom. Stoddard* v. *United States Fidelity & Guaranty Co.,* 234 N. Y. 618; *Vaughan* v. *United States Title Guaranty & Indemnity Co.,* 137 App. Div. 623; *Farmers' National Bank* v. *Van Slyke,* 49 Hun, 7; *Damon* v. *Empire State Surety Co.,* 161 App. Div. 875;

*Griggs* v. *Moors*, 168 Mass. 354; 47 N. E. 128; Stearns on The Law of Suretyship [4th ed.], § 15, pp. 13, 14.)

In *Farmers' National Bank* v. *Van Slyke* (49 Hun, 7) the court quotes (at p. 9) the rule laid down in Story's Equity Jurisprudence, where it is said: " If a party taking a guaranty from a surety conceals from him facts which go to increase his risk and suffers him to enter into the contract under false impressions as to the real state of the facts, such a concealment will amount to a fraud because the party is bound to make the disclosure; and the omission to make it, under such circumstances, is equivalent to an affirmation that the facts do not exist."

It is true that where redress is sought for fraudulent concealment it must appear that the party seeking relief relied upon the one with whom he was doing business disclosing the true facts and circumstances relating to the transaction, and that the suppression of such facts was an inducement which moved him to enter into the agreement. There can be no redress for something which does not influence another to act, because no damage has accrued. (*Taylor* v. *Guest*, 58 N. Y. 262, 266; *Wakeman* v. *Dalley*, 51 id. 27; *Hotchkin* v. *Third National Bank of Malone*, 127 id. 329, 337.)

Mr. Sherman has not come forward to tell us in so many words that, in signing this guaranty, the security afforded by Hatfield's one-sixth interest in the homestead of his father was a *sine qua non* for his action. But Sherman's lips are closed in death, and he cannot speak. The law is not so unreasonable as to exact the impossible; it does not require such proof to be furnished by positive, direct evidence; it may be established by circumstantial proof. Speaking of the burden which rests on a party seeking to recover for deceit founded upon false representations to show that he was influenced by them to his damage, Judge CHARLES ANDREWS, in *Taylor* v. *Guest* (58 N. Y. 262, says, at p. 266): " It does not require very strong proof to establish it. In most cases it may be inferred from the circumstances attending the transaction."

We are dealing here with an appeal from a decree of the Surrogate's Court, which is taken upon the facts as well as the law. Under such circumstances we have the same power to decide questions of fact which the surrogate had. (Surr. Ct. Act, § 309.) It is quite apparent that Mr. Sherman was misled into the belief that he was protected in signing these contracts of guaranty by the fact that the bank held an assignment of Mr. A. R. Hatfield's interest in the entire estate of his father as collateral for his loans at the bank, and that it was the duty of the bank to tell the truth, and correct the false impression entertained by decedent.

But the bank calls attention to the fact that on May 5, 1932, Albert R. Hatfield and his wife reconveyed to the First Citizens Bank and Trust Company their interest in the homestead farm, and urges that, under these circumstances, appellants have sustained no loss or injury, and, therefore, cannot be heard to complain.

The fact that the bank was anxious to get back this security which it parted with on January 22, 1913, nineteen years before, is somewhat of an acknowledgment that it had not dealt fairly with decedent when it concealed from him the fact of this release. However that may be, I do not think that the reconveying to the bank of Hatfield's interest in the homestead in 1932, nearly two years after Mr. Sherman's death, can be said to relieve the bank from responsibility for its failure to deal honestly and fairly with the decedent during his lifetime.

Speaking of a somewhat similar situation, it was said in *Barns v. Barrow* (61 N. Y. 39, at p. 42): " It is a case of pure guaranty; a contract which is said to be *strictissimi juris;* and one in which the guarantor is entitled to a full disclosure of every point which would be likely to bear upon his disposition to enter into it. The consideration of the contract does not enure to him, but to another. He assumes the burden of a contract without sharing in its benefits. He has a right to prescribe the exact terms upon which he will enter into the obligation, and to insist on his discharge in case those terms are not observed. It is not a question whether he is harmed by a deviation to which he has not assented. He may plant himself upon the technical objection, this is not my contract, *non in hæc fœdera veni.*"

Nor do I think we can say with any degree of assurance that under the circumstances no injury has befallen Mr. Sherman, or his estate. The farm was fluctuating in value all these years. What it was worth when Hatfield reconveyed his interest therein to the bank does not appear. It is common knowledge that there was little demand for real estate in the early thirties, and what little was sold was disposed of at a sacrifice. What would have happened if the bank had held this security all these years, no one can say. If decedent had known the true facts, he probably would never have signed either guaranty.

To hold that the assignment of May 5, 1932, which was made nearly two years after Mr. Sherman's death, and without his knowledge or consent, or that of his executors, took the place of the assignment of May 7, 1910, and put the parties back in *status quo*, would be equivalent to making a new contract between the bank and the dead guarantor, and this the court may not do.

If I am right in the conclusion which I have reached, it becomes unnecessary to discuss the other interesting questions raised by appellants.

For the reasons stated, the decree should be modified by disallowing the fourth item of the claim as stated in the decree, and as modified affirmed, with costs to appellants against the claimant personally.

All concur, except THOMPSON, J., who dissents and votes for affirmance. Present — SEARS, P. J., EDGCOMB, THOMPSON, CROSBY and LEWIS, JJ.

Decree modified on the law and facts in accordance with the opinion and as modified affirmed, with costs to the appellants against the claimant individually.