CONTINENTAL BANK N.A., Plaintiff,

v.

Robinson EVERETT, Kathrine Everett, and J.H. Froelich, Defendants.

No. 90 C 1476.

United States District Court, N.D. Illinois, E.D.

March 28, 1991.

---

Howard J. Roin, Janet L. Reed, Lynn D. Thesing, Andrew S. Marovitz, Mayer, Brown & Platt, Chicago, Ill., for plaintiff.

Robert E. Wiss, James R. Figliulo, Jeffrey C. Blumenthal, Patrick R. Gabrione, Foran, Wiss & Schultz, Chicago, Ill., for defendants Robinson Everett and Kathrine Everett.

Ronald J. Guild, William H. Hrabak, Michael J. Kralovec, Feiwell, Galper & Lasky, Chicago, Ill., for defendant J.H. Froelich.

## MEMORANDUM ORDER

BUA, District Judge.

In 1984, plaintiff Continental Bank N.A. ("Continental") loaned a substantial sum of money to a North Carolina corporation. After that corporation filed for bankruptcy, Continental demanded repayment from eight individuals who guaranteed the loan. Having been paid by five of the guarantors, Continental seeks payment from the remaining three: Robinson Everett, Kathrine Everett, and J.H. Froelich. Continental contends that there is no factual dispute on the issue of liability and, therefore, its claim against these three guarantors may be resolved on summary judgment. This court agrees, and grants Continental's motion for summary judgment.

## I. FACTS

The following facts are not in dispute. In 1983, an agent of Guilford Telecasters, Inc. ("Guilford") contacted Continental for purposes of obtaining a loan. Guilford, a North Carolina corporation, needed financing to operate a television station in North Carolina.

Several months of negotiations culminated in a loan agreement dated January 1, 1984. Pursuant to this agreement, Continental loaned $4,200,000 to Guilford. In connection with the loan, defendants Robinson Everett, Kathrine Everett, and J.H. Froelich agreed to guarantee repayment of the loan. The guaranty agreements were also executed on January 1, 1984. On December 31, 1985, Guilford executed and delivered a term note to Continental in evidence of the $4,200,000 loan.

To secure repayment of the loan, Continental obtained a security interest in Guilford's assets.[1] For the most part, Continental perfected its security interest in this collateral by filing the requisite financing statements with the appropriate governmental entities. Continental, however, did not perfect its security interest with respect to three of Guilford's most valuable assets: 1) Guilford's operating license from the Federal Communications Commission ("FCC"); 2) Guilford's broadcast tower lease; and 3) Guilford's studio lease.

For approximately two years, Guilford honored its obligations under the loan agreement. In 1986, Guilford's financial situation deteriorated. Guilford filed for Chapter 11 bankruptcy on December 31, 1986. Uncomfortable with this situation, Continental accelerated the payment schedule. On January 1, 1987, Continental sent a letter to Guilford demanding immediate payment in full.

As a debtor-in-possession, Guilford was in critical need of working capital to meet its daily operating expenses. Guilford's

---

1. The collateral for the loan is specified in section 6.1 of the loan agreement:

6.1 *Collateral.* Payment of [Guilford's] obligations hereunder and under the Notes shall be secured by the following:

(a) a first lien and security interest in favor of [Continental] in [Guilford's] accounts, chattel paper, general intangibles (including, but not limited to, any and all Franchises and FCC licenses), inventory, equipment (including, but not limited to, all cable, wires, appliances, towers, antennae, poles, studio equipment, converters, tools, vehicles and fixtures) and instruments, as those terms are defined in the Illinois Commercial Code, and the pro-

ceeds thereof, whether now owned or hereafter acquired, which lien and security interest shall be created by the Security Agreement; and

(b) an assignment of each of the Leases pursuant to the Assignments of Lease; and

(c) a pledge of all the issued and outstanding capital stock of the Company (the "Pledged Shares") pursuant to the Pledge Agreements.

*Loan Agreement,* § 6.1. As further evidence of Continental's security interest in Guilford's assets, the parties executed a security agreement dated January 1, 1984.

only source of funds was cash collateral.[2] Because Continental had a security interest in Guilford's cash collateral, Guilford needed either Continental's consent or the authorization from the bankruptcy court to use the collateral. On January 16, 1987, the United States Bankruptcy Court for the Middle District of North Carolina (the court presiding over Guilford's bankruptcy) entered an order authorizing Guilford to use the cash collateral on a limited basis. Approximately three weeks later, the bankruptcy court entered a consent order which permitted Guilford to continue using the cash collateral. *See In re Guilford Telecasters, Inc.,* No. B–86–02633C–11 (Bankr. M.D.N.C. Feb. 5, 1987). The order was subject to several conditions for the protection of Continental's interests. One such condition was that Guilford's loan payments be made on a weekly basis.

Guilford continued paying Continental until May 1987. Unable to maintain its loan obligations, Guilford went into default. At that point, the guarantors picked up the loan payments. In 1989, however, the guarantors also stopped paying Continental. To enforce the guaranties, Continental filed this lawsuit in federal court (based on diversity jurisdiction).[3] Robinson Everett, Kathrine Everett, and J.H. Froelich then moved to dismiss the case for lack of personal jurisdiction. That motion was denied. *See Continental Bank N.A. v. Everett,* 742 F.Supp. 508 (N.D.Ill.1990). Continental now moves for summary judgment.

## II. DISCUSSION

Continental may prevail on its motion for summary judgment only if there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liber-*

ty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)).

■ Continental asserts that there is no genuine issue of material fact with respect to defendants' liability under the guaranty agreements. In an action to enforce a guaranty under Illinois law,[4] a prima facie case is established "when the plaintiff enters proof of the original indebtedness, the debtor's default and the guarantee." *Mid-City Indus. Supply Co. v. Horwitz,* 132 Ill.App.3d 476, 483, 87 Ill.Dec. 279, 285, 476 N.E.2d 1271, 1277 (1985). None of these elements are in dispute. Continental is therefore entitled to judgment on the guaranties unless defendants have a valid defense.

Defendants have asserted four affirmative defenses and three counterclaims in opposition to Continental's claim. Since the allegations in defendants' counterclaims are parallel to those set forth in the affirmative defenses, the defenses and counterclaims shall be treated together.

### A. First Affirmative Defense/Counterclaim

In their first defense, defendants raise three separate arguments regarding the collateral for the loan. First, defendants allege that when they executed the guaranty agreements, Continental failed to disclose a material fact—*i.e.,* that it is legally impossible to obtain a security interest in an FCC license. Second, defendants assert that their guaranties were conditioned on Continental's ability to perfect a security

---

**2.** Cash collateral includes funds collected from Guilford's accounts and accounts receivable.

**3.** According to Continental, approximately $2,800,000 (excluding interest and collection expenses) remains due and owing on the loan.

**4.** The parties do not dispute that Illinois law governs this loan transaction. *See Loan Agreement,* § 12.5; *Guaranty,* § 8(e).

interest in all of the collateral. Third, defendants seek a discharge from the guaranties based on an "unjustified impairment of collateral" theory. The court will examine each theory separately.

1. Failure to Disclose a Material Fact

■ According to defendants, they entered into the guaranty agreements with the understanding that the loan was secured by more than enough collateral to protect them from loss in the event of a default by Guilford. The loan agreement stated that the loan would be secured by a first lien and security interest in the assets listed as collateral. *Loan Agreement*, § 6.1(a), *supra* note 1. Defendants apparently relied on Continental to take the necessary steps to perfect a security interest in the collateral put up by Guilford. What defendants did not realize, however, was that a party cannot obtain a security interest in an FCC broadcast license. *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986). This is significant because the FCC license was one of Guilford's most valuable assets, a fact which Continental does not dispute. Defendants insinuate that Continental was aware that a security interest in the license could not be obtained, yet chose not to inform them. Defendants further assert that they would not have executed the guaranties if Continental had disclosed the fact that a security interest in the FCC license could not be obtained. Based on Continental's nondisclosure, defendants seek a complete discharge from their obligations under the guaranties.

■ In response, Continental argues that defendants have expressly waived any objections to Continental's failure to perfect a security interest in the collateral. Specifically, Continental relies on section 6(c) of the guaranty agreement, which contains the following waiver provision: "The Guarantor hereby expressly waives ... all diligence in ... protection of or realization upon ... any security for [the loan]." *Guaranty*, § 6(c). Continental also emphasizes that under section 6(a), it has the discretion to release or surrender its security interest. *Id.* § 6(a). These clauses are

unavailing. Contractual waiver provisions do not foreclose defendants' first argument because defendants have brought Continental's good faith into question. In Illinois, a duty of good faith and fair dealing is implied in every contract (including guaranties), *Dayan v. McDonald's Corp.*, 125 Ill. App.3d 972, 989–90, 81 Ill.Dec. 156, 169, 466 N.E.2d 958, 971 (1984); *McHenry State Bank v. Y & A Trucking, Inc.*, 117 Ill. App.3d 629, 632–33, 73 Ill.Dec. 485, 488, 454 N.E.2d 345, 348 (1983); *see also Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir.1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); and the obligation to perform in good faith may not be waived. *BA Mortgage and Int'l Realty Corp. v. American Nat'l Bank and Trust Co.*, 706 F.Supp. 1364, 1376 (N.D.Ill.1989); *Morris v. Columbia Nat'l Bank*, 79 B.R. 777, 785 (N.D.Ill.1987).

■ As a matter of law, a creditor does not stand in a fiduciary relationship with the guarantor. *Farmer City State Bank v. Guingrich*, 139 Ill.App.3d 416, 423, 94 Ill.Dec. 1, 6, 487 N.E.2d 758, 763 (1985). In certain cases, however, the duty of good faith may require the creditor "to inform [the guarantor] of circumstances which materially increase [the] risk as guarantor." *McHenry State Bank*, 117 Ill. App.3d at 634, 73 Ill.Dec. at 489, 454 N.E.2d at 349. If the creditor takes any action which "increases the guarantor's risk or deprives the guarantor of the opportunity to protect himself," the guarantor should be released from the guaranty to the extent of his injury. *Id.* at 633, 73 Ill.Dec. at 488, 454 N.E.2d at 348.

In this case, there is evidence in the record that Continental knew, at the time of contracting, that it could not perfect a security interest in Guilford's FCC license. Continental did not inform defendants of this fact, even though the license was a valuable asset. But this nondisclosure, standing alone, does not demonstrate that Continental was acting in bad faith. There is absolutely no evidence that Continental actively concealed material facts from defendants. The ability to obtain a security interest in a license is a matter of law, and

such information was available to defendants from sources other than Continental. Notwithstanding Continental's duty of good faith, defendants have an obligation to make an inquiry into all circumstances that are relevant to their risk as guarantors. *St. Charles Nat'l Bank v. Ford*, 39 Ill.App.3d 291, 295, 349 N.E.2d 430, 434 (1976). Defendants should have made some inquiry into the facts affecting their risk; their failure to do so precludes them from complaining of Continental's failure to disclose.

Defendants admit that as early as August 1987, they learned that Continental did not have a security interest in the FCC license. Rather than raising an objection to the collateral at that time, they continued to make payments under the guaranties for two more years. In light of the fact that defendants continued to honor their guaranties after discovering the truth, there is reason to question the sincerity behind defendants' declarations of bad faith. The Illinois Supreme Court has suggested that the failure to promptly object upon the discovery of fraud may, under certain circumstances, amount to a waiver. *Eisenberg v. Goldstein*, 29 Ill.2d 617, 195 N.E.2d 184 (1963), *cert. denied*, 377 U.S. 964, 84 S.Ct. 1645, 12 L.Ed.2d 735 (1964). In *Eisenberg*, the court stated:

> A person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence, so as to afford both parties an opportunity to be restored to their original position. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of relief from the misrepresentations.

*Id.* 29 Ill.2d at 622, 195 N.E.2d at 186–87. At any rate, it is unnecessary to reach the waiver question because there is insufficient evidence pointing to a lack of good faith on the part of Continental.

Defendants have not cited any Illinois cases in which a creditor was deemed to have acted in bad faith by failing to disclose information relating to the risk of the guaranty. Instead, defendants rely primarily on a not-so-recent New York case, *First Citizens Bank & Trust Co. v. Sherman's Estate*, 250 A.D. 339, 294 N.Y.S. 131 (1937). In that case, the guarantor (Sherman) guaranteed a bank loan to his son-in-law (Hatfield). The guaranty agreement purported to fully detail the collateral securing the loan. At the top of the list of collateral was Hatfield's interest in the estate of his father, which Hatfield had assigned to the bank. The bulk of this estate consisted of a farm. Prior to the execution of the guaranty, the bank released its interest in the farm back to Hatfield. When Sherman signed the guaranty, he did not know that the loan was no longer secured by the farm, and the bank failed to inform him. The court concluded that the bank's nondisclosure amounted to fraud:

> While in many instances mere silence cannot be made the basis of fraud, yet, where the circumstances are of such a nature as to impose a duty upon one to speak, and where he deliberately fails to do so, his neglect will be deemed a deliberate suppression of the truth, and will amount to constructive, if not actual, fraud.

294 N.Y.S. at 139. Having determined that Sherman was misled by the bank's description of the collateral, the court disallowed the bank's claim for enforcement of the guaranty. *Id.* 294 N.Y.S. at 142.

Defendants also look to *Chemical Bank v. Layne*, 423 F.Supp. 869 (S.D.N.Y.1976) for support. In *Chemical Bank*, the guarantor sought a discharge from his guaranty on the ground that the bank failed to disclose that certain stock held as collateral contained restrictions (which reduced the value of the stock as collateral). When the guarantor inquired into the value of the stock, the bank did not inform him that it was restricted. The guarantor stated that he would not have executed a guaranty if he had been fully informed by the bank. Because the bank failed to disclose a material fact upon the guarantor's inquiry into the underlying collateral, the court found

the guaranty to be unenforceable. *Id.* at 882.

In stark contrast to the banks involved in those two cases, Continental did not deliberately suppress pertinent information *that was not readily available* to the guarantors. While recognizing the bank's duty of disclosure as described in *Sherman's Estate,* the court in *Chemical Bank* emphasized that "duties of inquiry and awareness fall upon the guarantor." *Id.* at 871. "To ensure the enforceability of guaranties, banks need do no more than make full and fair disclosure in response to the inquiry of a potential guarantor." *Id.* at 881. Far from supporting defendants' position, *Chemical Bank* made it clear that guarantors have an obligation to seek important information and inform themselves—an obligation which, as stated earlier, was not satisfied in this case.

It is not entirely clear why defendants chose to guaranty such a large loan without first inquiring into the status of the collateral. Defendants' nescience in this case is particularly inexcusable: as principals and shareholders of Guilford, defendants were intimately familiar with the company and the value of its assets as collateral. Having failed to make any inquiry whatsoever, defendants now cannot seek to void the guaranties based on Continental's silence.

### 2. Collateral as a Condition Precedent

Defendants' second argument is that Continental's ability to perfect a security interest in the collateral was a condition precedent to their performance under the guaranties. Since Continental did not per-

fect a security interest in the FCC license, Guilford's tower lease, or Guilford's studio lease, defendants contend that they should be excused from their guaranties. This court disagrees.

None of the guaranty agreements or corresponding loan documents confirm defendants' assertion that obtaining a security interest in all of the collateral was a condition precedent to the guaranties. There is no reference to such a condition precedent in the contracts.[5] Nor is there any evidence of an unwritten mutual understanding between Continental and the guarantors. Continental never made any oral representations which validate the existence of the alleged condition. And, while defendants contend that they believed that the guaranties were conditional, they did not communicate this belief to Continental.

Although the loan was to be secured by Guilford's assets, it does not necessarily follow that the guaranties were conditioned on Continental's ability to perfect a security interest in those assets. The guaranty agreements certainly do not provide any support for defendants' argument; those agreements expressly provide that repayment is "unconditionally" guaranteed. *See Guaranty,* § 1. The agreements also vested Continental with discretion to release or surrender its security interest without notice to the guarantors. *Id.* § 6(a). Given the fact that Continental could release its security interest without altering its rights under the guaranties, it seems implausible that the guaranties were conditioned on perfecting the security interests.[6]

---

**5.** Defendants claim that the condition precedent can be found in section 10 of the loan agreement. Defendants' reliance on that section is misplaced. Section 10 merely specifies the conditions that had to be met by *Guilford* before Continental would issue the initial revolving loan. It simply does not speak to the issue of whether defendants' guaranties were conditioned on Continental's ability to obtain a security interest.

**6.** Defendants contend that this case is controlled by *State Bank v. Cirivello,* 74 Ill.2d 426, 24 Ill.Dec. 839, 386 N.E.2d 43 (1978), a case in which twelve limited partners guaranteed a loan to the partnership. When the guaranty was

executed in *Cirivello,* the bank represented that the loan would not be made unless all thirteen of the limited partners in the partnership personally guaranteed repayment. Yet the bank disbursed the loan even though only twelve of the thirteen limited partners signed the guaranty. The partnership defaulted, prompting the bank to file suit against the guarantors. The court held that the guaranty was unenforceable because the loan was conditioned on all thirteen limited partners becoming guarantors. *Id.* at 433, 24 Ill.Dec. at 842, 386 N.E.2d at 46. Despite defendants' heavy reliance on *Cirivello,* this court agrees with Continental that *Cirivello* is distinguishable from the case at bar. Continental, unlike the bank in *Cirivello,* never made

■ Even if the guaranties were conditional, defendants still cannot justify their nonperformance. The security agreement, which granted Continental a security interest in Guilford's assets, was for the benefit of Continental, not the guarantors. *Security Agreement,* ¶ 2. Continental was therefore free to waive its right to perfect a security interest in each and every unit of collateral. *See FDIC v. Nanula,* 898 F.2d 545, 550 (7th Cir.1990).[7]

This court will not allow defendants to use the security agreement, an agreement executed for the benefit and protection of Continental, as a basis for nonperformance under the guaranties. *See Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1291 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1202 (2d Cir.1980). The governing contracts were hammered out after several months of negotiations. Absent any solid evidence of a condition precedent, whether created by written or oral agreement, the contracts as written will be presumed to reflect the full intent of the parties. The court declines defendants' invitation to set aside the guaranties based on some unsubstantiated inference. Accordingly, the court rejects defendants' second argument.

3. Unjustified Impairment of Collateral

■ The final argument raised in defendants' first affirmative defense also rests on Continental's failure to perfect a security interest in the FCC license, the tower lease, and the studio lease. Defendants characterize this omission as a breach of Continental's duty of good faith, which "result[ed] in an unjustified impairment of collateral, discharg[ing] the obligations of the defendants under the guaranties by operation of law." *Joint Amended Answer to Complaint,* ¶ 47. Insofar as this argu-

ment is premised on Continental's failure to perfect a security interest in the FCC license, the court has already addressed this issue and resolved it in favor of Continental. Setting aside the FCC license, the court must still address defendants' argument regarding the tower and studio leases.

As an initial matter, the court notes that there is nothing in the record which supports defendants' argument. Defendants have come forward with no facts upon which to infer that Continental acted in bad faith by failing to perfect a security interest in the leases. While Continental should have taken better care to protect its own security interests, defendants cannot attribute an improper motive to Continental based on that proposition alone. Defendants allege that they were relying solely on Continental's efforts in handling the collateral; but there is no indication that Continental was aware of this fact. Defendants never put Continental on notice that they were depending on Continental to file all the necessary documentation to perfect a security interest in the leases. Without showing that Continental was aware of defendants' reliance, defendants can hardly prove that Continental's omissions rose to level of bad faith. Considering the fact that defendants made no effort to stay informed as to the status of the collateral, they are in no position to complain of Continental's inaction or question its underlying motives.

In any event, to prevail on their unjustified impairment of collateral defense, defendants do not have to establish that Continental acted in bad faith. Unfortunately for defendants, the waiver clauses set forth in the guaranties, which do not come into

---

any representation or otherwise led the guarantors to believe that the guaranties were subject to a condition precedent. The remaining cases cited by defendants, see *United States v. Hub City Volkswagen, Inc.,* 625 F.2d 213 (9th Cir. 1980); *Mount Prospect State Bank v. Forestry Recycling Sawmill,* 93 Ill.App.3d 448, 48 Ill.Dec. 889, 417 N.E.2d 621 (1980); *Federal Nat'l Bank & Trust Co. v. Shanon Drilling, Inc.,* 762 P.2d 928 (Okla.1988), which involved evidence of a condition precedent, are equally distinguishable.

7. A strong argument could also be made that defendants waived the condition, if one indeed existed. In 1987, defendants first discovered that Continental had not perfected its security interest in certain collateral. Defendants nonetheless continued to make payment in accord with the guaranties until 1989. After complying with the guaranties for over two years, defendants now contend that the guaranties are unenforceable. In this court's view, defendants' actions speak louder than their words.

play with respect to defendants' bad faith argument, do affect defendants' impairment of collateral defense. Defendants' objection to Continental's failure to perfect a security interest, unlike good faith conduct, is waivable. *See Morris*, 79 B.R. at 781–82.

In determining whether defendants waived their rights, the court looks to the language of the guaranties. "Where a contract of guaranty is unequivocal in its terms it must be interpreted according to the language used, for it is presumed that the parties meant what their language clearly imports." *National Acceptance Co. v. Exchange Nat'l Bank*, 101 Ill.App.2d 396, 402, 243 N.E.2d 264, 267 (1968). The guaranty agreements in this case contain the following waiver clause:

> (c) *The Guarantor hereby expressly waives:* (i) notice of the acceptance by the Bank of this Guaranty, (ii) notice of the existence or creation or non-payment of all or any of the Liabilities, (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever, and (iv) *all diligence in collection or protection of or realization upon the Liabilities or any thereof, any obligation hereunder, or any security for or guaranty of any of the foregoing.*

*Guaranty*, § 6(c) (emphasis added). In addition, the guaranties permit Continental to release, surrender, or substitute any of its security interests:

> (a) The Bank may, from time to time, whether before or after any discontinuance of this Guaranty, *at its sole discretion and without notice to the Guarantor*, take any or all of the following actions: ... (iv) *release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any property securing any of the Liabilities or any obligation hereunder*, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property, and (v) resort to the Guarantor for payment of any of the Liabilities, whether or not the Bank shall have resorted to any property securing any of the Liabilities or any obligation hereunder or shall have proceeded against any other obligor primarily or secondarily obligated with respect to any of the Liabilities.

*Id.* § 6(a) (emphasis added). Based on the express language in the guaranties, the court concludes that defendants have waived their right to complain of Continental's failure to perfect a security interest. Other courts have found similar contractual provisions to constitute a waiver of the guarantor's rights. *See FDIC v. Hardt*, 646 F.Supp. 209, 212–13 (C.D.Ill.1986); *Exchange Nat'l Bank v. Brown*, 41 U.C.C. Rep.Serv. (Callaghan) 895, 897–98, 1985 WL 2274 (N.D.Ill.1985); *National Acceptance Co. v. Wechsler*, 489 F.Supp. 642, 646–47 (N.D.Ill.1980); *National Acceptance Co. v. Demes*, 446 F.Supp. 388, 390–91 (N.D.Ill.1977); *Ishak v. Elgin Nat'l Bank*, 48 Ill.App.3d 614, 617, 6 Ill.Dec. 630, 632–33, 363 N.E.2d 159, 161–62 (1977). The agreements executed by defendants disclaim "all diligence" in the "protection of or realization upon" "any security" for the loan. *Guaranty*, § 6(c).[8] Even if, as defendants argue, section 6(c) is not explicit

---

**8.** Pointing to Ill.Rev.Stat. ch. 26, para. 1–102(3) (1989), defendants contend that obligations of diligence may not be waived. That statutory provision states as follows:

> The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care *prescribed by this Act* may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

*Id.* (emphasis added). Contrary to defendants' contention, paragraph 1–102(3) is inapplicable. The statute does not prevent disclaimers of diligence in all circumstances; it only prevents parties from disclaiming provisions of the Uniform Commercial Code which prescribe obligations of diligence. *See* Ill.Ann.Stat. ch. 26, para. 1–102 (Smith–Hurd) (Uniform Commercial Code Comment). Unable to identify any provisions in the Code that prescribe Continental's diligence in perfecting its security interests in this case, defendants cannot invoke paragraph 1–102(3).

enough to constitute a valid waiver, section 6(a) provides ample support to conclude that defendants have waived their impairment of collateral defense. Section 6(a) unambiguously states that Continental may release its security interest without any notice to the guarantors. "To say that the creditor can completely dispose of collateral but would retain liability to perfect on the very same collateral does not make sense." *Hardt,* 646 F.Supp. at 213. By consenting to the release or surrender of the collateral, defendants cannot protest Continental's failure to perfect a security interest.[9]

The terms of the guaranties were freely negotiated by sophisticated parties, and defendants have not proffered a viable basis for avoiding the effect of these terms. Thus, defendants have waived their right to complain of Continental's failure to perfect its security interest.

In sum, the court concludes that none of the arguments asserted in defendants' first affirmative defense and counterclaim can withstand Continental's motion for summary judgment.

### B. Second Affirmative Defense/Counterclaim

■ Defendants' second defense and counterclaim stem from a payment schedule agreement allegedly breached by Continental. Defendants assert that sometime after Guilford filed for bankruptcy, the parties entered into a payment agreement that modified the original terms of repayment. The original loan agreement provided for a reduction of principal on a quarterly basis. For the first two years, the quarterly payments were to be made at a rate of 1.5% of the outstanding principal balance. The following year, the rate of repayment increased to 3.5% of the principal. The quarterly payments were to increase to 5.0%, 6.0%, and 7.0% in the fourth, fifth, and sixth years respectively. Under the

modified repayment schedule, the loan would continue to be amortized at a rate of 1.5% per quarter, with no yearly increase. In consideration for maintaining the rate of repayment at 1.5%, defendants agreed to accelerate payment of principal and interest from a quarterly basis to a monthly basis. Defendants claim that this new repayment schedule was to be in effect until the bankruptcy proceeding was finally resolved—that is, pending a successful reorganization of Guilford or the liquidation of its assets. In 1989, while the bankruptcy was still pending, Continental allegedly breached the payment agreement by demanding payment in accord with the original terms of the loan agreement.

At the outset, Continental has denied the very existence of the alleged repayment scheme. Although defendants have detailed the terms of the agreement in their joint amended answer, they cannot merely rest on their pleading. Defendants bear the burden of proof on their affirmative defenses and counterclaims, and they "must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir.1988) (emphasis in original). After reviewing all of the briefs, affidavits, and exhibits submitted in this case, the court is unable to conclude that defendants have come forward with enough facts to create a genuine issue as to whether the parties entered into a binding agreement.

The guaranties expressly provide that Continental is not bound by any proposed modification of the terms of the guaranties unless such modification is in writing and signed by Continental. *See Guaranty,* § 8(a) ("nor shall any modification or waiver of any of the provisions of this Guaranty be binding upon the Bank except as expressly set forth in a writing duly signed and delivered on behalf of the Bank").

---

**9.** The security agreement provides additional support for Continental's waiver argument. Paragraph 6.3 of the agreement states that Continental has no affirmative duty with respect to perfecting its own security interests: "[t]he Bank shall have *no duty as to the* collection or

*protection of the Collateral* or any part thereof or any income thereon, *or as to the preservation of any rights pertaining thereto,* beyond the safe custody of any Collateral actually in the Bank's possession." *Security Agreement,* ¶ 6.3 (emphasis added).

Since the terms of the alleged payment agreement were not outlined in a writing signed by Continental, the payment agreement is not binding on Continental.

■ Assuming that Continental could be bound by an oral modification of the guaranties, there is insufficient evidence in the record that Continental actually sat down and agreed to modify the repayment terms of the existing loan and guaranty agreements. Defendants maintain that the payment agreement arose from the consent order entered by the bankruptcy court in early 1987, and that they made their monthly payments pursuant to that order. *See Defendants' Joint Response to Continental Bank's Memorandum in Support of its Motion for Summary Judgment*, at 23, 26, 28. But even the consent order states that any payments made pursuant to the order did not relieve defendants of their primary obligations to Continental: "The terms of this Order ... shall not affect in any way the liability of any guarantors of any obligations of [Guilford] to [Continental]." *In re Guilford Telecasters, Inc.*, No. B–86–02633C–11, at 8 (Bankr. M.D.N.C. Feb. 5, 1987).

In support of their position that Continental amended the terms of repayment, defendants rely primarily on several letters that Continental's local counsel sent to the guarantors on a monthly basis between 1987 and 1989. These letters set forth the pro rata share of the loan payments which were attributable to each guarantor for the particular monthly period. Defendants insist that the letters reflected Continental's intent to maintain a payment schedule at a steady 1.5% rate of amortization.

There is nothing to suggest that by sending these letters, Continental bound itself to continue accepting reduced payments indefinitely. Perhaps Continental accepted smaller monthly payments to accommodate defendants' financial difficulties. Nonetheless, by accepting the monthly payments, Continental did not expressly surrender its right to enforce the plain terms of the guaranties. *See United States v. Bachman*, 601 F.Supp. 1537, 1541–42 (E.D. Wis.1985). Continental, moreover, never made any representation or otherwise gave any indication that the guarantors would be released if the payments were accelerated. To the contrary, the guaranties specifically state that the guarantors are not relieved of their obligation if the payments are accelerated: "The Guarantor hereby unconditionally guarantees the full and prompt payment when due, *whether by acceleration* or otherwise...." *Guaranty*, § 1 (emphasis added). Any acceleration of payment, in the absence of bad faith, does not excuse the guarantors from their primary obligations under the guaranty agreements.

Defendants, however, have attempted to excuse their nonperformance on the ground that Continental committed a breach of the duty of good faith. This implied duty serves to protect the reasonable expectations of the parties. *Dayan*, 125 Ill.App.3d at 991, 81 Ill.Dec. at 170, 466 N.E.2d at 972. Stated differently, the parties to a contract may not take opportunistic advantage of one another. *Jordan*, 815 F.2d at 438. The court is not convinced that under the circumstances of this case, Continental was opportunistic in its enforcement of the guaranties. Guilford's financial demise certainly provided reasonable grounds for uncertainty on the part of Continental. There is no evidence that Continental acted arbitrarily when seeking prompt payment from the guarantors. Defendants essentially maintained a unilateral expectation that the loan payments would remain constant for an indefinite period of time. But defendants cannot avoid the force of the guaranty agreements based on this largely unsubstantiated expectation.

Defendants' second affirmative defense and counterclaim do not preclude the entry of summary judgment in favor of Continental.

### C. Third Affirmative Defense/Counterclaim

■ In their third defense and counterclaim, defendants again accuse Continental of committing a breach of the duty of good faith and fair dealing. In support of this accusation, defendants contend that Conti-

nental was uncooperative in Guilford's efforts at reorganization. When Guilford's stockholders decided to replace the general manager (ostensibly for the good of the company), they requested Continental's cooperation in the matter. Before implementing a change in management, however, defendants had to obtain the approval of the bankruptcy court. Defendants now assert that Continental did not provide any assistance in obtaining the court's approval. As further evidence of a lack of good faith, defendants point to the fact that Continental voted against the reorganization plan submitted by Guilford in the bankruptcy proceeding—a plan supported by a majority of the stockholders and guarantors. By voting against the proposed plan, Continental allegedly "protracted the Chapter 11 proceeding and prevented defendants from obtaining approval of a plan of reorganization whereunder their loss on guaranties would be substantially reduced without preventing plaintiff from receiving full payment." *Joint Amended Answer to Complaint,* ¶ 65. Defendants contend that Continental also breached its good faith duty by "precipitously" filing this lawsuit while the parties were still negotiating an acceptable plan of reorganization.

From a factual standpoint, it is apparent that Continental did not take any position during the bankruptcy proceedings with respect to Guilford's proposed change in management. If defendants are suggesting that in order to discharge its duty of good faith, Continental had to take affirmative steps in support of the managerial change, then defendants' argument may be summarily rejected. Defendants have cited no authority which places such an affirmative duty on creditors to actively promote the decisions of the debtor, irrespective of that creditor's interests. Similarly, there is no reason why Continental should have voted in favor of a proposed plan of reorganization if that plan was against its interests in collecting on the loan. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1358 (7th Cir.1990) ("The Bank was entitled to advance its own interests, and it did not need

to put the interests of Debtor and Debtor's other creditors first.").

The implied duty of good faith provides a check against discretionary actions that are arbitrary or capricious, *Dayan,* 125 Ill. App.3d at 991, 81 Ill.Dec. at 170, 466 N.E.2d at 972, not those that are arguably justified under the contract and surrounding circumstances. When the guarantors stopped making the loan payments altogether, Continental had every reason to enforce its rights under the loan and guaranty agreements. The filing of this lawsuit was indeed justified. As for defendants' assertion that the lawsuit was filed without adequate notice, the court directs defendants' attention to section 6(c) of the guaranties, wherein defendants unambiguously waived their right to notice.

Defendants' third defense and counterclaim cannot defeat Continental's motion for summary judgment.

### D. *Fourth Affirmative Defense*

Neither Continental (in its motion for summary judgment) nor defendants (in their response thereto) have even mentioned the fourth affirmative defense. Defendants' fourth defense consists of the following sentence:

Upon information and belief, Continental has been paid in excess of $2.5 million dollars by these defendants and others and accordingly the plaintiff has received payments which have not been properly credited in computing whatever amount might be owed to plaintiff under their guaranties, assuming any liability exists under those documents.

*Joint Amended Answer to Complaint,* ¶ 68. In regard to the issue of liability, there is nothing in the record which illuminates the significance of this defense. The amount already paid by defendants may serve to reduce the amount of damages recoverable by Continental (which is not at issue here), but it will not support a wholesale dismissal of Continental's claim. This defense does not preclude summary judgment on the issue of liability.

Finally, the court will briefly address a jurisdictional matter. When this court pre-

viously denied defendants' motion to dismiss for lack of personal jurisdiction, the court stated that "Continental must nonetheless adduce sufficient facts at trial demonstrating the existence of personal jurisdiction." *Everett*, 742 F.Supp. at 512 n. 7. After reviewing the statement of facts and exhibits submitted by the parties, the court finds that the facts supporting the finding of jurisdiction under the Illinois long-arm statute are not in dispute. Consequently, there are no jurisdictional barriers to the entry of summary judgment in this case.

## III.  CONCLUSION

The court finds that Continental has established all of the elements of its claim and that defendants have no valid affirmative defenses or counterclaims. Therefore, Continental's motion for summary judgment is granted.

IT IS SO ORDERED.